## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ~~COLUMBIA~~

|  |  |
|---|---|
| IN RE MEDIA APPLICATION FOR AUDIOVISUAL ACCESS TO TRIAL PROCEEDINGS IN UNITED STATES OF AMERICA V. DONALD J. TRUMP | Case: 1:23–mc–00099<br>Assigned To : Chutkan, Tanya S.<br>Assign. Date : 10/5/2023<br>Description: Misc.<br><br>Hearing Requested |

## MEDIA COALITION'S APPLICATION FOR AUDIOVISUAL ACCESS
## TO CRIMINAL TRIAL PROCEEDINGS

Pursuant to Local Criminal Rule 57.6, the E.W. Scripps Company (operator of Court TV), along with Advance Publications, Inc., American Broadcasting Companies, Inc. d/b/a ABC News, The Associated Press, Bloomberg L.P., Cable News Network, Inc., Dow Jones & Company, Inc., publisher of The Wall Street Journal, Los Angeles Times Communications LLC, National Association of Broadcasters, National Cable Satellite Corporation d/b/a C-SPAN, National Press Photographers Association, News/Media Alliance, The New York Times Company, POLITICO LLC, Radio Television Digital News Association, Society of Professional Journalists, TEGNA Inc., Univision Networks & Studios, Inc., and WP Company LLC d/b/a The Washington Post, (together, the "Media Coalition") respectfully submit this Application for leave to record and telecast the March 2024 criminal trial of former President Donald J. Trump, Case No. 23-cr-000257-TSC. Alternatively, the Media Coalition respectfully requests that the Court contemporaneously publish on YouTube its internally administered audiovisual livestreams and recordings of the proceedings. As a final alternative, the Media Coalition respectfully requests that the Court release visual and audio recordings of proceedings at the conclusion of each day that this matter is heard in Court.

## PRELIMINARY STATEMENT

As the U.S. Supreme Court observed over four decades ago, in recognizing a First Amendment right for the public to attend criminal trials, "[t]o work effectively, it is important that society's criminal process satisfy the appearance of justice, and the appearance of justice can best be provided by allowing people to observe it." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 571-72 (1980) (cleaned up). Since the founding of our Nation, we have never had a criminal case where securing the public's confidence will be more important than with *United States v. Donald J. Trump*. The prosecution of a former President, now a presidential contender, on charges of subverting the electoral process, presents the strongest possible circumstances for continuous public oversight of the justice system. That oversight, rooted in decades of First Amendment precedent and sound judicial policy, will be functionally illusory without audiovisual access to these proceedings. Through counsel, Trump has repeatedly spoken out about the importance of cameras in the courtroom in this case. For his benefit, and that of the Court and the public, real-time audiovisual coverage will be a critical step in stemming false conspiracy theories across the entire spectrum of public opinion, regardless of the trial's outcome.

While Rule 53 of the Federal Rules of Criminal Procedure and Local Criminal Rule 53.1.1, on their face, create a *per se* prohibition on the broadcast of criminal proceedings to those unable to attend in person, they of course cannot contravene a First Amendment right. And, to be meaningful in the unique circumstances of this case, that right must include a right of first-hand observation beyond those few dozen people who are able to squeeze into the courtroom. While other federal courts have not yet recognized a First Amendment right to telecast criminal

trials, the U.S. Supreme Court has not squarely addressed the question since *Richmond Newspapers*, and the D.C. Circuit has never considered the issue.

Because the various decisions affirming the constitutionality of the *per se* bans of Rule 53 and Local Rule 53.1.1 rest on outdated and long-disproven views about recording and broadcasting trials, they are unpersuasive here. As applied to this historic and unprecedented prosecution, those rules simply cannot justify restricting the public's right and ability to view this trial for themselves. A *per se* ban is unconstitutional here, and the Media Coalition respectfully asks that the Court allow Americans to see and hear the trial and other proceedings in real time, as is their right.

## BACKGROUND

Following the November 3, 2020, election in which Joseph R. Biden, Jr. was elected President of the United States, then-President Trump refused to concede, "claiming that the election was 'rigged' and characterized by 'tremendous voter fraud and irregularities[.]'" *Trump v. Thompson*, 20 F.4th 10, 17 (D.C. Cir. 2021), *cert. denied*, 142 S. Ct. 1350 (2022). On January 6, 2021, hours before a Joint Session of Congress met to certify the election results, "President Trump took the stage at a rally of his supporters on the Ellipse, just south of the White House," and soon afterward his supporters, "including some armed with weapons and wearing full tactical gear," "marched to the Capitol and violently broke into the building to try and prevent Congress's certification of the election results." *Id.* at 17-18. This was the "most significant assault on the Capitol since the War of 1812." *Id.* at 18-19.

Trump was impeached for "incitement of insurrection" the following week. House Impeachment Managers conducted a five-day trial before the Senate in February 2021, and the

Senate voted to acquit Trump.[1]  The proceedings were televised, and "an average of 11 million viewers watched the opening arguments across MSNBC, CNN, Fox, ABC and CBS"—without counting online viewers.[2]  The House of Representatives later initiated its own investigation of the attack on the Capitol, with at least 20 million people watching the first day of the House Select Committee hearings.  On average, 13 million viewers watched over the following days, again not including online viewers.[3]

The indictment released in this matter on August 1, 2023 (the "Indictment") alleges that, as the sitting President in late 2020 and early 2021, Trump knowingly made false claims about election fraud, *see* Indictment, ECF No. 1, ¶¶ 11-12, used deceit in an effort to get state officials to change election results in five key states, *id.* ¶¶ 13-52, attempted to organize fraudulent electors to send false certificates to Congress, *id.* ¶¶ 53-69, attempted to leverage the Justice Department to interfere with the election, *id.* ¶¶ 70-85, attempted to enlist the Vice President to fraudulently alter the election certification, *id.* ¶¶ 86-105, and exploited violence at the Capitol, *id.* ¶¶ 106-24, all to countermand the electoral will of the American people.  The Indictment asserts four felony counts: Conspiracy to Defraud the United States under 18 U.S.C. § 371, Conspiracy to Obstruct an Official Proceeding under 18 U.S.C. § 1512(k), Obstruction of and

---

[1] H.R. Res. 24, 117th Cong. (Jan. 13, 2021), https://www.congress.gov/bill/117th-congress/house-resolution/24; Nicholas Fandos & Emily Cochrane, *Impeachment Trial: Trump Is Acquitted by the Senate*, N.Y. Times (Feb. 13, 2021), https://www.nytimes.com/live/2021/02/13/us/impeachment-trial.

[2] Brian Stelter, *How many people are watching the impeachment trial? Here are the numbers…*, CNN (Feb. 12, 2021), https://www.cnn.com/2021/02/11/media/us-senate-impeachment-trial-reliable-sources/index.html.

[3] John Koblin, *At Least 20 Million Watched Jan. 6 Hearing*, N.Y. Times (June 10, 2022), https://www.nytimes.com/2022/06/10/business/media/jan-6-hearing-ratings.html; Rick Porter, *TV Ratings: Jan. 6 Hearings Draw 17.7M in Primetime*, Hollywood Reporter (July 22, 2022), https://www.hollywoodreporter.com/tv/tv-news/tv-ratings-thursday-july-21-2022-1235185046/.

Attempt to Obstruct an Official Proceeding under 18 U.S.C. §§ 1512(c)(2), 2, and Conspiracy

Against Rights under 18 U.S.C. § 241. *See generally id.*

Trial in this case is currently scheduled to begin on March 4, 2024. *See* Pretrial Order,

ECF No. 39, at ¶ 1. It is unclear at this point how many members of the press and the general

public will be permitted to attend the trial in person given space considerations and security

concerns, but the answer is likely no more than a few dozen. Recognizing the limits to physical

access in this Court, and the historic importance of this case, Trump's lead counsel has publicly

called for televised proceedings, noting that the public should be able weigh the evidence itself.

> "If I appear in court, I'm going to be representing not only the President of the United States, but the sovereign citizens of this county, who deserve to hear the truth. The first thing we would ask for is let's have . . . cameras in the courtroom, so that all Americans can see what's happening in our criminal justice system. And I would hope that the Department of Justice would join in that effort so that we take that curtain away and all Americans get to see what's happening."

*See He did 'absolutely nothing wrong': Trump attorney John Lauro*, Fox News (July 21, 2023),

https://www.foxnews.com/video/6331632263112 at 6:05-6:31.[4]

In contrast to the federal courts, in Georgia state court, where Trump and 18 others have

been indicted on "criminal charges related to their efforts to overturn Trump's 2020 election loss

in Georgia,"[5] charges that overlap with allegations in this case, the court has announced that—

---

[4] *See also* Anders Hagstrom, *Trump attorney calls for Jan. 6 trial to be televised, accuses prosecutors of hiding trial*, Fox News (Aug. 6, 2023), https://www.foxnews.com/politics/trump-attorney-calls-jan-6-trial-be-televised-accuses-prosecutors-hiding-trial; *Trump lawyer: I personally want cameras in courtroom*, CNN (Aug. 6, 2023), https://www.cnn.com/videos/politics/2023/08/06/sotu-lauro-court-cams.cnn.

[5] *Trump indicted in Georgia over attempts to overturn 2020 election*, Wash. Post (Aug. 15, 2023), https://www.washingtonpost.com/national-security/2023/08/14/trump-georgia-election-investigation/.

like the impeachment proceedings and the House Select Committee hearings—the proceedings

will be televised and streamed live on the court's YouTube channel.[6]

## ARGUMENT

### I.  THE PUBLIC AND PRESS HAVE A CONSTITUTIONAL RIGHT OF ACCESS TO CRIMINAL TRIAL PROCEEDINGS

"What transpires in the court room is public property."  *Craig v. Harney*, 331 U.S. 367,

374 (1947).  As such, and surveying judicial experience and the practical benefits of openness,

the Supreme Court recognized in the landmark *Richmond Newspapers* ruling that "the right to

attend criminal trials is implicit in the guarantees of the First Amendment."  448 U.S. at 580.  As

the Chief Justice emphasized, this constitutional right fosters faith in government, because

"[p]eople in an open society do not demand infallibility from their institutions, but it is difficult

for them to accept what they are prohibited from observing," *id.* at 572:

> The crucial prophylactic aspects of the administration of justice cannot
> function in the dark; no community catharsis can occur if justice is done in
> a corner or in any covert manner.  It is not enough to say that results alone
> will satiate the natural community desire for satisfaction.  A result
> considered untoward may undermine public confidence, and where the
> trial has been concealed from public view an unexpected outcome can
> cause a reaction that the system at best has failed and at worst has been
> corrupted.

*Id.* at 571 (cleaned up).  The Supreme Court reiterated that interest in *Globe Newspaper Co. v.*

*Superior Court*, in overturning an order closing a trial involving a sexual offense alleged to have

been committed against a minor victim:

> [T]he right of access to criminal trials plays a particularly significant role
> in the functioning of the judicial process and the government as a whole.
> Public scrutiny of a criminal trial enhances the quality and safeguards the

---

[6] Jozsef Papp, *Fulton judge says Trump court proceedings will be televised*, Atlanta J.-Const.
(Aug. 31, 2023), https://www.ajc.com/politics/fulton-judge-says-trump-court-proceedings-will-be-televised/GNUTN4TYAVCQ7IPMOONTIY6SJM/.

> integrity of the factfinding process, with benefits to both the defendant and
> to society as a whole. . . . And in the broadest terms, public access to
> criminal trials permits the public to participate in and serve as a check
> upon the judicial process — an essential component in our structure of
> self-government.

457 U.S. 596, 606 (1982) (footnote omitted).  Thus, because "the press and general public have a

constitutional right of access to criminal trials," any "circumstances under which the press and

public can be barred from a criminal trial are limited; the State's justification in denying access

must be a weighty one." *Id.* at 603, 606-07; *see also United States v. Brice*, 649 F.3d 793, 795

(D.C. Cir. 2011) (Kavanaugh, J.) (noting that "the Supreme Court has found that the public has a

right of access to criminal trials" and related proceedings); *Wash. Post v. Robinson*, 935 F.2d

282, 287-88 (D.C. Cir. 1991) (recognizing that "[t]he first amendment guarantees the press and

the public a general right of access to court proceedings and court documents unless there are

compelling reasons demonstrating why it cannot be observed" and applying test to plea

agreements); *CNN v. United States*, 824 F.2d 1046, 1049 (D.C. Cir. 1987) (summarily reversing

closure of voir dire to press and public).[7]

The Supreme Court more recently explained that the First Amendment provides a right of

*meaningful* access, and courts are therefore "obligated to take every reasonable measure to

accommodate public attendance at criminal trials." *Presley v. Georgia*, 558 U.S. 209, 215

(2010) (per curiam).  "[A] mandatory rule [of exclusion], requiring no particularized

determination in individual cases, is unconstitutional." *Globe Newspaper*, 457 U.S. at 611 n.27.

To defeat the presumptive constitutional rights of press and the public to observe proceedings, as

---

[7] This right of access also applies to a variety of pre-trial proceedings.  *See, e.g., Press-Enter. Co. v. Superior Court*, 478 U.S. 1 (1986) (preliminary hearing in criminal case) ("*Press-Enter. II*"); *Press-Enter. Co. v. Superior Court*, 464 U.S. 501 (1984) (voir dire examinations of jury venire) ("*Press-Enter. I*"); *see also Brice*, 649 F.3d at 795-96; *CNN*, 824 F.2d at 1047-48.

the Supreme Court has repeatedly held, closure must be justified by "an overriding interest based on findings that [it] is essential to preserve higher values and is narrowly tailored to serve that interest." *Press-Enter. I*, 464 U.S. at 510; *accord Globe Newspaper*, 457 U.S. at 608-09.

These rationales for transparent criminal proceedings have particular resonance in this case, where a polarized electorate includes tens of millions of people who, according to opinion polls, still believe that the 2020 election was decided by fraud.[8]  A lack of openness can lead to distrust of the judicial system, particularly if the outcome is unexpected, *Richmond Newspapers*, 448 U.S. at 571—which is a potential outcome here, should the verdict in this federal prosecution ultimately differ from the verdict in the Georgia prosecution.  Openness "enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." *Press Enter. I*, 464 U.S. at 508.  There can be no dispute, therefore, that the public and press have a constitutional right of access to these proceedings.

---

[8] *See, e.g., Most Say Fundamental Rights Under Threat - Partisan identity determines which specific rights people feel are at risk*, Monmouth Univ. (June 20, 2023), https://www.monmouth.edu/polling-institute/reports/monmouthpoll_US_062023/ ("The poll finds that 3 in 10 Americans (30%) – including two-thirds (68%) of Republicans – believe that Joe Biden only won the presidency because of voter fraud.").  The rationale for a right of access, of course, includes more than those who voted for Trump.  In this case, he is charged with seeking to subvert the legal outcome of the election by disenfranchising the more than 81.3 million people who cast votes for his opponent.  The federal Crime Victims' Rights Act affords victims not only a right of notice of any public court proceeding "involving the crime," but also "[t]he right not to be excluded from any such public court proceeding."  18 U.S.C. § 3771(a)(2)-(3).  Yet even if every single courtroom (other than the trial courtroom) in the Elijah Barrett Prettyman U.S. Courthouse were used for overflow seating, only a minute fraction of the 81.3 million victims of this alleged conspiracy would be able to attend and observe the proceedings for themselves.  *See also* Gov't's Resp. to Court's Aug. 3, 2023 Minute Order, ECF No. 23 (noting "the *public's* strong interest in a speedy trial—an interest guaranteed by the Constitution and federal law in all cases, but of particular significance here") (emphasis added).

II.     **BOTH HISTORY AND LOGIC SUPPORT EXTENDING THE ACCESS RIGHT, IN THIS CASE, TO AUDIOVISUAL ACCESS**

The right of access to judicial proceedings grounded in the First Amendment must be more than theoretical.  As a practical matter, in a case like this, which will affect literally hundreds of millions of people, the right must mean more than limiting access to those who can fit into the small courtroom or the overflow rooms that the Court will provide.  As the *Richmond Newspapers* Court explained, "it is difficult for [people] to accept what they are prohibited from observing."  448 U.S. at 572.  Indeed, what concerned the Court in *Richmond Newspapers* was that "what takes place at a trial would lose much meaning if access *to observe* the trial could, as it was here, be foreclosed arbitrarily."  *Id.* at 576-77 (emphasis added).  History and logic, the touchstones for recognizing a First Amendment access right, *Press-Enter. II*, 478 U.S. at 8-9, support that right here.

A.     **A Historical Tradition Of *Meaningful* Access Stretches Back To Nation's Founding And Remains Central Today.**

The Court rested its holding in *Richmond Newspapers* on tradition, dating back to the "days before the Norman Conquest."  448 U.S. at 565.  Throughout English history and during the American colonial period, "part of the very nature of a criminal trial was its openness to those who wished to attend."  *Id.* at 568.  Community members always had the "right to observe the conduct of trials."  *Id.* at 572.  Observing proceedings—attending them, learning about them, judging them—was part of the fabric of social life: "It would be hard to overemphasize the importance of the ceremonial at the center of coming together on court day."  Rhys Isaac, *The Transformation of Va. 1740 - 1790* 88 (1982) ("*Isaac*").  At the founding of the Nation, in the small, face-to-face communities, citizens encountered authority chiefly "through participation in courthouse proceedings," and attending trials involved "participat[ing] in discovering the meaning of the law[.]"  A.G. Roeber, *Faithful Magistrates and Republican Lawyers* 74 (1981)

("*Roeber*").  Doing so "served not only to make the community a witness to important decisions

and transactions but also to teach men the very nature and forms of government." *Isaac* at 88.

Citizens "left the stage of court day . . . secure in the sense that they had shaped and ratified

communal affairs." *Roeber* at 74.

It is telling that, after former Vice President Aaron Burr was arrested for treason in 1807

at the order of President Thomas Jefferson, Chief Justice John Marshall decided to move the trial

to the much larger Hall of the Virginia House of Delegates in Richmond to accommodate the

high turnout—*i.e.*, allowing those of the public who wanted to attend the trial the opportunity to

do so. *United States v. Burr*, 4 Cranch 455, 25 F. Cas. 2, 11 (D. Va. Cir. Ct. 1807) ("On the

suggestion of counsel that it would be impossible to accommodate the spectators in the court

room, the chief justice adjourned to the hall of the house of delegates.").  As a result, thousands

of people "thronged" to the courthouse to see and hear the proceedings.[9]  More than two

centuries later, no legislative hall is capable of accommodating all of the people with a

democratic interest in this trial, but there is a technological solution.

### B.      Remote, Virtual Attendance At Proceedings Is Consistent With Our Historical Traditions, As The Trial Of Derek Chauvin Recently Demonstrated.

Recent experience proves that technological solutions serve the public's First

Amendment right to witness important and historic criminal trials.  The May 2020 police murder

of George Floyd, on a Minneapolis public street and captured on video, prompted nationwide

outrage and protests and reinvigorated a social justice movement.[10]  The state court criminal trial

---

[9] Robert Strauss, *John Marshall: The Final Founder* 205 (2021).

[10] Audra D. S. Burch, Amy Harmon, Sabrina Tavernise & Emily Badger, *The Death of George Floyd Reignited a Movement. What Happens Now?  Calls for racial justice touched nearly every aspect of American life on a scale that historians say has not happened since the*

of Derek Chauvin for that killing, during the pandemic, presented a challenge for transparency,

as the court had limited courtroom space due to social-distancing rules.  Recognizing the

importance of this criminal trial to public confidence in the judicial system, the court ordered live

broadcast of the criminal trial in order to fulfill the constitutional requirement for *meaningful*

public access.  The court permitted cameras despite a general prohibition for broadcasts from

Minnesota courtrooms:

> It is expected that, even with some overflow courtrooms, the demand by
> family members, the public, and the press to attend the joint trial will
> outstrip the court's ability to provide meaningful access. This Court
> concludes that the only way to vindicate the Defendants' constitutional
> right to a public trial and the media's and public's constitutional right of
> access to criminal trials is to allow audio and video coverage of the trial,
> including broadcast by the media[.]

Order Allowing A/V Coverage of Trial, *Minnesota v. Chauvin* (Nov. 4, 2020),

https://mncourts.gov/mncourtsgov/media/High-Profile-Cases/27-CR-20-12646/27-CR-20-

12646_Order-Regarding-Audio-Video-Coverage.pdf; *see also* Order Denying Reconsideration of

Order Granting A/V Coverage of Trial, *Minnesota v. Chauvin* (Dec. 18, 2020) at 2,

https://mncourts.gov/mncourtsgov/media/High-Profile-Cases/27-CR-20-12646/Order12182020.pdf

(same, explaining the courtroom configuration: "[O]nly one seat in the courtroom is not

designated for use by a trial participant and, if the trial is televised, a technician will occupy that

chair.  No other seating is available in the trial courtroom.  It would be farcical to say that this

arrangement, by itself, provides meaningful access to the public or the press.").

---

*civil rights movement of the 1960s*, N.Y. Times (Apr. 20, 2021),
https://www.nytimes.com/2021/04/20/us/george-floyd-protests-police-reform.html.

**C.      Audiovisual Access In This Case Logically Serves The Interest Of Justice.**

Without addressing any constitutional issue, the Supreme Court in 2010 considered whether district court regulations allowing streaming of a civil bench trial complied with rulemaking requirements.  *Hollingsworth v. Perry*, 558 U.S. 183 (2010) (reversing judgment below on procedural grounds).  The majority acknowledged that "[t]he question whether courtroom proceedings should be broadcast has prompted considerable national debate" and that "[r]easonable minds differ on the proper resolution of that debate and on the restrictions, circumstances, and procedures under which such broadcasts should occur." *Id.* at 189.  In ruling narrowly on the procedural question presented, the Court declined to "express any views on the propriety of broadcasting court proceedings generally." *Id.*  Four justices, however, joined a dissent arguing, among other things, that "[n]either the applicants nor anyone else 'has been able to present empirical data sufficient to establish that the mere presence of the broadcast media inherently has an adverse effect on [the judicial] process,'" *id.* at 205 (Breyer, J., dissenting) (quoting *Chandler v. Florida*, 449 U.S. 560, 578-79 (1981)), and that, in the context of broadcasting the particular trial challenging a California proposition with broad impact—limiting marriage to heterosexual couples—"the public interest weighs in favor of providing access to the courts," *id.* at 207.[11]

––––––––––––––––––––––––

[11] Study after study has concluded that in-court cameras have not impaired the administration of justice. *See, e.g., In re Petition of Post-Newsweek Stations, Fla., Inc.*, 370 So. 2d 768, 775 (Fla. 1979) (finding that, after a one-year experiment, concern that cameras in the courtroom would negatively affect lawyers, judges, witnesses or jurors was "unsupported by any evidence."). *See also* N.Y. State Comm. to Review Audio Visual Coverage of Ct. Proceedings, *An Open Courtroom: Cameras in N.Y. Cts. 1995-1997 (*Apr. 4, 1997); *Report of the Comm. On Audio-Visual Coverage of Ct. Proceedings* (May 1994); Ernest H. Short & Assocs., *Evaluation of Cal.'s Experiment with Extended Media Coverage of Cts.* (Sept. 1981); *Report of the Chief Admin. Judge to the Legislature, the Governor, and the Chief Judge of the State of N.Y. on the Effect of Audio-Visual Coverage on the Conduct of Jud. Proceedings* (Mar. 1989).

As the Supreme Court recognized in *Chandler* and in the dissent in *Hollingsworth*, we now have accumulated evidence to establish that audiovisual access to trials logically serves the public interest.  The court's decision to allow all Americans to watch the high-profile Chauvin trial on television, for example, earned widespread praise from media observers,[12] participants, the chief judge of that court, and the chief federal judge of that district:

- Minnesota Attorney General Keith Ellison, whose office opposed camera coverage of the Chauvin trial, told a broadcaster after the trial ended that his viewpoint had changed: "Things went better than I thought they were going to," he said. "I thought it would alter the way the lawyers handled the case and handled the evidence, but it went pretty well."[13]

- In the same interview, prosecution team member Steve Schleicher compared the cameras to "shopping at Target. You didn't really notice. You just go in and you do your thing."[14]

- Mary Moriarty, Hennepin County Public Defender for more than thirty-one years and a now Hennepin County Attorney, tweeted, "I was against cameras in the courtroom at the beginning of this trial, but I may have to move off that position because this trial exposed so much of what happens that the public has no way of knowing."[15]

- Hennepin County Chief Judge Toddrick Barnette told The Associated Press that he grew to feel "comfortable that [the media] were really interested in the integrity of the

---

[12] *See, e.g.*, Alissa Wilkinson, *The power of televising Derek Chauvin's trial: We saw George Floyd die onscreen. We need to see this too*, Vox (Apr. 7, 2021), https://www.vox.com/22364721/george-floyd-chauvin-trial-televised.

[13] Paul Blume (@PaulBlume_FOX9), Twitter (Apr. 26, 2021, 4:47 PM), https://twitter.com/PaulBlume_FOX9/status/1386784094911008768 at 2:09-2:16.

[14] *Id.* at :01-:05.

[15] *See* Mary Moriarty (@MaryMoriarty), Twitter (Apr. 21, 2021, 8:18 PM), https://twitter.com/MaryMoriarty/status/1385025113867702273.

process," that they "worked very hard to make sure there were no violations of Judge

Cahill's order" governing the details of audiovisual coverage, and that one of the benefits

of livestreaming the trial was the public's ability to watch and learn from the process.[16]

- U.S. District Court of Minnesota Chief Judge Patrick Schiltz also recognized the

    importance of real-time transmission from the state courtroom.  In an interview with the

    *Star Tribune* upon his appointment, Chief Judge Schiltz said that when the presiding state

    judge allowed livestreaming of the Chauvin trial, "I thought that was a huge mistake but

    by the time he was done I admitted I was wrong."  As the Chief Judge explained:

    > "It really helped people see what a criminal trial looked like," said Schiltz,
    > who pointed out that viewers could see how "'careful" such trials are often
    > managed while also observing the more monotonous, technical moments
    > of a trial.

    > "At the end of the day it built confidence," Schiltz said.[17]

The *Minnesota v. Chauvin* experience is not unique.  Along with the experiences of the

state courts, that trial amply demonstrates the contribution that broadcasting has made to public

confidence in the outcome of a given criminal proceeding and, more generally, in our judicial

system.  When the Supreme Court first considered the issue, only two states permitted cameras

in their courts.  *Estes v. Texas*, 381 U.S. 532, 544 (1965).  Today, forty-nine states and the

District of Columbia either permit journalists to capture proceedings on their own cameras,

---

[16] *Trial of other cops charged in Floyd's death to be broadcast*, The Associated Press (Apr. 30, 2021), https://apnews.com/article/trials-death-of-george-floyd-arts-and-entertainment-238d7de7253d0d550aff76c47199428a.

[17] Stephen Montemayor, *New chief federal Judge Patrick Schiltz sees caseloads, security as Minnesota court's top issues*, Star Tribune (July 11, 2022), https://www.startribune.com/new-chief-federal-judge-patrick-schiltz-sees-caseloads-security-as-minnesota-courts-top-issues/600189351/.

authorize courts to provide video or audio webcasts of proceedings, or both.[18]  Since the

COVID-19 pandemic began, courts have further embraced technology to make their proceedings

more accessible to the public—including not only through remote video hearings in trial courts,

but also through live audio feeds from the U.S. Supreme Court as well as from every federal

appellate court—in both civil *and* criminal cases.[19]

The courts have recognized that cameras in the courtrooms have a positive impact on the

justice system by providing *meaningful* public access to the courtroom.  Audiovisual broadcast

of the prosecution of Trump here would likewise serve the logical function of helping to secure

public confidence in the outcome of the case.[20]

### D.    Modern Technology Permits Non-Disruptive Audiovisual Coverage In Court.

The disruptive impact of electronic media that concerned the *Estes* Court has dissipated

with the evolution of the technology.  In *Estes*, the trial judge had allowed cameras to record pre-

---

[18] *See Cameras In The Courts – A State-By-State Coverage Guide*, Radio Television Digital News Ass'n, https://courts.rtdna.org/cameras-overview.php.

[19] Some 100,000 people listened to the first two weeks of Supreme Court arguments in May 2020 when the live broadcasts began, far more than the hundreds who could have attended live. *See* Melissa Wasser, *Summary of Supreme Court Oral Argument Numbers*, Reporters Comm. for Freedom of the Press (Nov. 23, 2020), https://perma.cc/6MUH-9P3K.  During the 2021–2022 term, arguments were streamed at least 3.8 million times. *No More Lines: Millions Stream Live Supreme Court Arguments*, Project on Gov't Oversight (Sept. 22, 2022), https://perma.cc/WZ44-83R8.  As of this summer, all of the federal appellate courts are continuing to stream audio of oral arguments live. *See As We Await Word from SCOTUS on its Broadcast Plans, We Can Report That All U.S. Cts. of Appeals Are Still Livestreaming*, Fix the Court (July 31, 2023), https://perma.cc/Z75X-C2TU.

[20] Without cameras, what the public will see and hear are the sound bites from out-of-court interviews and images from outside of the courtroom.  Parties and their supporters will be left, unchecked, to spin the descriptions of in-court events or even mischaracterize them. *See, e.g.*, *Trump v. Clinton*, 2023 U.S. Dist. LEXIS 11432, at *21 (S.D. Fla. Jan. 19, 2023) (ordering Trump to pay attorneys' fees for frivolous litigation, and finding that he "consistently misrepresented and cherry-picked portions of public reports and filings to support a false factual narrative").

trial and trial proceedings, causing "considerable disruption" as at least 12 cameramen operated devices with "telltale red lights," and "the courtroom was a mass of wires, television cameras, microphones and photographers." 381 U.S. at 536, 546, 550. Today, video cameras are now small, silent, and unobtrusive—and, indeed, the majority of Americans carry one around themselves, as a ubiquitous and integral feature of their smartphones, and routinely and wirelessly consume, create, and share audiovisual content.[21]

Technology has evolved to the point that the presence of a camera in a courtroom is entirely unobtrusive. Today, electronic media routinely record trial court proceedings without creating disturbance, through the use of a silent, remote-controlled camera no larger than surveillance cameras currently in many courtrooms (including in this Court), inconspicuously placed away from the participants, with no additional lighting required, and with few, if any, wires or technicians in sight. *E.g., Katzman v. Victoria's Secret Catalogue*, 923 F. Supp. 580, 582 (S.D.N.Y. 1996) (even as early as 1996, Court TV's "equipment [wa]s no more distracting in appearance than reporters with notebooks or artists with sketch pads").

Moreover, given the pervasiveness of the medium, many Americans now expect to see recordings of public events—and, indeed, courts over the past dozen years have also started to recognize a general First Amendment right to make audiovisual recordings in public places.[22]

---

[21] *See Mobile Fact Sheet*, Pew Rsch. Ctr. (Apr. 7, 2021), https://www.pewresearch.org/internet/fact-sheet/mobile/ (85% of Americans reported owning a smartphone in 2021 survey). By 2019, people were spending more time on mobile devices than watching traditional television. *See* Wendy Lee, *People spend more time on mobile devices than TV, firm says,* L.A. Times (June 5, 2019), https://www.latimes.com/business/la-fi-ct-people-spend-more-time-on-mobile-than-tv-20190605-story.html.

[22] *See, e.g., Fields v. City of Phila.*, 862 F.3d 353, 356 (3d Cir. 2017) ("[T]he First Amendment protects the act of photographing, filming, or otherwise recording police officers conducting their official duties in public."); *Turner v. Driver*, 848 F.3d 678, 690 (5th Cir. 2017)

There is now, in short, no "reasonable likelihood" that the simple presence of an unobtrusive camera or cameras in a courtroom, in a society in which audiovisual recording is pervasive, "disparages the judicial process." *Estes*, 381 U.S. at 595 (Harlan, J., concurring). Just as Justice Harlan predicted in *Estes*, "re-examination" is now required of the case law that permits cameras to be banned under Federal Criminal Rule 53.

The means exist today, through audiovisual recording and dissemination, for *all* Americans to exercise their constitutional right to observe trials, particularly a historic case like this one. To suggest that the First Amendment right to observe a proceeding is limited to *only* members of the press and public able to get a seat in the courtroom would turn *Richmond Newspapers* on its head—by compelling, in Chief Justice Burger's words, the "community [to] surrender its right to observe the conduct of trials." 448 U.S. at 572; *see United States v. Antar*, 38 F.3d 1348, 1360 (3d Cir. 1994) ("[F]or what exists of the right of access if it extends only to those who can squeeze through the door?"). If the technology exists to provide to all citizens the "right of visitation," 448 U.S. at 527, with no disruption to the proceedings, *Richmond Newspapers* and its progeny must mean that—at least as a presumptive matter—the First Amendment requires remote access through that technology. Only then will citizens share equally in the exercise of a First Amendment right.[23]

---

(same); *ACLU v. Alvarez*, 679 F.3d 583, 608 (7th Cir. 2012) (same); *Glik v. Cunniffe*, 655 F.3d 78, 83 (1st Cir. 2011) (same).

[23] Live audiovisual coverage not only provides an opportunity to attend and observe, but also is the best and most effective opportunity to do so. Indeed, as other courts have noted, the values identified at the core of *Richmond Newspapers* "can be fully vindicated only if the opportunity for personal observation is extended to persons other than those few who can manage to attend the trial in person." *United States v. Criden*, 648 F.2d 814, 822 (3d Cir. 1981); *accord CNN v. ABC*, 518 F. Supp. 1238, 1245 (N.D. Ga. 1981) ("[I]t cannot be denied that television news coverage plays an increasingly prominent part in informing the public at large of the workings of government."). No third-hand account or cold transcript fully substitutes for witnessing a

III.   **CIRCUMSTANCES HAVE CHANGED SINCE EARLIER APPELLATE DECISIONS DENIED REQUESTS FOR AUDIOVISUAL ACCESS TO FEDERAL CRIMINAL TRIALS**

Just seventeen years after finding that cameras violated a defendant's due process rights in *Estes*, the Supreme Court, in approving a Florida program to televise criminal trials, made clear that the Constitution did not require a *per se* ban "on state experimentation with an evolving technology, which, in terms of modes of mass communication, was in its relative infancy in 1964, and is, even now, in a state of continuing change." *Chandler*, 449 U.S. at 573-74; *see also id.* at 582-83.  In so doing, the *Chandler* Court cited Justice Harlan's concurrence in *Estes*, which emphasized that "the day may come when television will have become so commonplace an affair in the daily life of the average person as to dissipate all reasonable likelihood that its use in courtrooms may disparage the judicial process." *Estes*, 381 U.S. at 595 (Harlan, J., concurring).

Today is that day.  As discussed *supra* at Part II.D, judicial experience and changing technology have undercut arguments against recognizing, in appropriate circumstances, that a constitutional access right includes audiovisual access, and that the Court may address any concerns about the integrity of the process through appropriate orders.  Court TV alone has broadcast more than 1,000 civil and criminal trials in this country and around the world, obediently following guidelines established by the courts in a pretrial broadcast order.  For example, jurors are never shown unless the court expressly permits, bench conferences are

---

proceeding—"one cannot transcribe an anguished look or a nervous tic." *ABC v. Stewart*, 360 F.3d 90, 99-100 (2d Cir. 2004); *see also Antar*, 38 F.3d at 1360 n.13 ("where a right of access exists, a court may not deny access to a live proceeding solely on the grounds that a transcript may later be made available" because "a transcript would not fully implement the right of access because some information, concerning demeanor, non-verbal responses, and the like is necessarily lost in the translation of a live proceeding to a cold transcript").

typically wide-shot without sound, microphones are active only when proceedings are in session, and microphones are muted at counsel tables. The names of jurors and the addresses of witnesses may be muted through short delays in transmitting broadcast signals from the courtroom or may be edited out of later broadcasts. If either the prosecution or defense has concerns about specific issues—such as video of a witness's arrival at court—those issues can be resolved through consultation and agreement on a protocol for audiovisual access, and set out in an Order by this Court.

Although the D.C. Circuit has not considered the issue, in the years following the Supreme Court's decisions in *Richmond Newspapers* and *Globe Newspaper* clarifying a constitutional right to attend trials, four federal appellate courts upheld the constitutionality of Criminal Rule 53. *See Conway v. United States*, 852 F.2d 187, 188-89 (6th Cir. 1988) (per curiam); *United States v. Edwards*, 785 F.2d 1293, 1296 (5th Cir. 1986); *United States v. Kerley*, 753 F.2d 617, 622 (7th Cir. 1985); *United States v. Hastings*, 695 F.2d 1278, 1284 (11th Cir. 1983). But these decades-old, pre-Internet decisions arose in criminal cases that did not involve alleged crimes committed by a once and potentially future President. The adverse circuit cases also arose in a different technological age. This Court can, and should, reach a different result at this time and in this case.

At bottom, no principled constitutional distinction separates the established right of citizens to observe legal proceedings first-hand and the right to record and broadcast those proceedings for the benefit of the many millions who cannot attend these proceedings in person. The nature of the constitutional right should not change depending on the means by which trials are observed. This trial should therefore be televised.

IV.   **IN THE ALTERNATIVE, THE COURT SHOULD PUBLISH COURT-ADMINISTERED AUDIOVISUAL LIVESTREAMS OR RECORDINGS OF THE TRIAL PROCEEDINGS**

This Court is already equipped to record and broadcast the criminal proceedings.  The District Court courtrooms have cameras, which are used to stream proceedings to the overflow and media rooms.[24]  Indeed, for President Trump's arraignment on August 11, the Court livestreamed proceedings to two separate media rooms for members of the media, as well as a public overflow room.[25]  The District Court is also equipped to make audio livestreams available online, as it is one of thirteen district courts participating in a pilot program and posting livestreams of select civil proceedings on YouTube.[26]  During the COVID-19 emergency, the District Court also utilized this equipment to provide the public access to all proceedings, including criminal hearings, through teleconference lines.[27]

Posting video or audio livestreams on YouTube would not cause any additional disruption within the courtroom, yet it would profoundly increase the number of interested members of the public who could observe the proceedings.  Alternatively, the Court records audio of criminal proceedings to facilitate the court reporter's work drafting official transcripts, and these recordings could likewise be made available contemporaneously or at the end of each

---

[24] *See* Dist. Ct. Media Room, https://www.dcd.uscourts.gov/district-court-media-room.

[25] *Pub. & Media Advisory*, U.S. Dist. Ct. for the Dist. of Columbia, https://www.dcd.uscourts.gov/sites/dcd/files/Public%20and%20Media%20Advisory%20for%20 Friday,%20August%2011,%202023.pdf.

[26] *See Nat'l Audio Streaming Pilot Program*, https://www.dcd.uscourts.gov/national-audio-streaming-pilot-program; *see also* @USCourtsDCD, YouTube, https://www.youtube.com/c/ USCourtsDCD.

[27] *See Pub. & Media Access to Ct. Proceedings during COVID-19 Emergency*, https://www.dcd.uscourts.gov/public-and-media-access-to-court-proceedings-during-covid-19-emergency.

day.  This also would not impose a great burden on Court staff already collecting and archiving audio.

This Court has repeatedly recognized the power of the audiovisual record in adjudicating Capitol riot cases, in which videos have been key pieces of evidence.  *See, e.g.*, *United States v. Rukstales*, 2021 U.S. Dist. LEXIS 264338, at *3-4 (D.D.C. Nov. 24, 2021) (in context of access to video exhibits shown in court during Capitol prosecutions, observing that while "the public record includes descriptions of his conduct that is in the video clips," "videos can do what words cannot," and the public has an "interest in understanding the conduct underlying the charges in these cases, as well as the government's prosecutorial decision-making").  Permitting the greater public the opportunity to observe in full the tenor, pace, and evidence presented in Trump's trial, through Court-administered audiovisual livestreams or recordings, would provide meaningful access to the public and contribute to public confidence in the outcome.

## CONCLUSION

We have never, in the history of our Nation, had a federal criminal trial that warrants audiovisual access more than the federal prosecution of former President Trump for allegedly trying to subvert the will of the people.  The central purpose of the constitutional right of access—the law that governs here—is to ensure fair trials and to promote confidence in the justice system.  Broadcasting the trial proceedings in this case will clearly advance that interest.

For the reasons set forth herein, the Media Coalition respectfully requests that this Court grant its Application and enter an order permitting the live broadcasting from the courtroom of further proceedings in this case, pursuant to the appropriate guidelines established by the Court.  Alternatively, the Media Coalition respectfully requests that the Court contemporaneously publish on YouTube its internally administered audiovisual livestreams and recordings of the

21

proceedings.  As a final alternative, the Media Coalition respectfully requests that the Court release visual and audio recordings of proceedings at the conclusion of each day that this matter is heard in Court.

**MEET AND CONFER CERTIFICATION**

Counsel for the Media Coalition conferred by email on October 1, 2023, with counsel for the United States and counsel for Trump.  Counsel for the United States informed the undersigned on October 3, 2023, that they oppose the relief sought in this Application.  Counsel for Trump has not yet responded as of this filing.

Dated:  October 5, 2023          Respectfully submitted,

BALLARD SPAHR LLP

/s/ *Chad R. Bowman*
Chad Bowman (#484150)
Charles D. Tobin (#455593)
Maxwell S. Mishkin (#1031356)
Lauren P. Russell (#1697195)
1909 K Street NW, 12th Floor
Washington, DC 20006
Telephone: (202) 661-2200
Fax: (202) 661-2299
bowmanchad@ballardspahr.com
tobinc@ballardspahr.com
mishkinm@ballardspahr.com
russelll@ballardspahr.com

*Counsel for the Media Coalition*

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of October, 2023, I caused true and correct copies of

the foregoing to be served via electronic mail and U.S. Mail on the following:

J.P. Cooney
Molly Gulland Gaston
Thomas Windom
U.S. Attorney's Office for the District of Columbia
555 Fourth Street, NW
Washington, DC 20530

*Counsel for the United States*

John F. Lauro
Filzah I. Pavalon
Lauro & Singer
400 N. Tampa Street
15th Floor
Tampa, FL 33602

Todd Blanche
Blanche Law
99 Wall Street
New York, NY 10005

*Counsel for Donald J. Trump*

/s/ *Chad R. Bowman*
Chad Bowman (#484150)