**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN RE MEDIA APPLICATION FOR AUDIOVISUAL ACCESS TO TRIAL PROCEEDINGS IN UNITED STATES OF AMERICA V. DONALD J. TRUMP** | **Case No. 23-mc-99 (TSC)** |
| **IN RE APPLICATION OF NBCUNIVERSAL MEDIA, LLC TO PERMIT VIDEO AND AUDIO OF TRIAL PROCEEDINGS IN UNITED STATES V. DONALD TRUMP** | **Case No. 23-mc-107 (TSC)** |

## UNITED STATES' OPPOSITION TO APPLICATIONS TO BROADCAST THE CRIMINAL TRIAL OF UNITED STATES V. TRUMP

## INTRODUCTION

A coalition of media organizations ("Media Coalition") and NBCUniversal Media ("NBCU") (collectively "Applicants"), seek permission to record and telecast, by various alternative means, the criminal trial of former President Donald J. Trump. The relief the Applicants seek is clearly foreclosed under Rule 53 of the Federal Rules of Criminal Procedure and Local Criminal Rule 53.1.1. Courts have long upheld Rule 53's constitutionality, and the Applicants provide no reasoned basis for a different result here. Whatever policy the Applicants believe supports their requested relief is not properly directed to the Court. And in any event, the Judicial Conference, which formulates policy for the federal courts, has long rejected the policy prescription the Applicants advocate, including as recently as September 2023. This Court should deny the Applications.

## STATEMENT

### 1.  Factual background

Under Rule 53 of the Federal Rules of Criminal Procedure, a "court must not permit the taking of photographs in the courtroom during judicial proceedings or the broadcasting of judicial proceedings from the courtroom" unless a statute or other Rule provides otherwise.  Fed. R. Crim. P. 53.  Local Rule 53.1.1 expands on Rule 53's broadcast prohibition, stating that:

> The taking of photographs and operation of tape recorders inside the United States Courthouse and radio and television broadcasting from inside the courthouse during progress of or in connection with judicial proceedings, including proceedings before a United States Magistrate Judge, whether or not court is actually in session, are prohibited.  A judge may, however, permit (1) the use of electronic or photographic means for the presentation of evidence or the perpetuation of a record, and (2) the broadcasting, televising, recording, or photographing of investiture, ceremonial, or naturalization proceedings.  Contents of official tapes that are made as part of the official record in a case will be treated in the same manner as official stenographic notes.

Loc. Crim. R. 53.1.  Like all Federal Rules, Rule 53 binds the federal courts once enacted.  *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 255 (1988) (holding that federal rules are "in every pertinent respect, as binding as any statute duly enacted by Congress, and federal courts have no more discretion to disregard [a] Rule's mandate than they do to disregard constitutional or statutory provisions").

Since its original adoption in 1946, Rule 53 has expressly prohibited the broadcasting of criminal trials in federal court.  In 1972, the Judicial Conference[1] went a step further by prohibiting

---

[1] The Judicial Conference is the policy-making arm of the federal court system.  *See generally Governance & the Judicial Conference*, Admin. Off. of the U.S. Cts., https://perma.cc/TW45-PT6S.  Under the Rules Enabling Act, 28 U.S.C. §§ 2072-2077, the Judicial Conference authorizes the appointment of a Standing Committee on Rules of Practice and Procedure, which advises the Judicial Conference with respect to rulemaking.  Separate advisory committees on the civil, criminal, appellate, evidence and bankruptcy rules report to and advise the Standing Committee. *See How the Rulemaking Process Works*, Admin. Off. of the U.S. Cts., https://perma.cc/CVU6-3VC9; *see also* 28 U.S.C. § 2073(a)(1) ("The Judicial Conference shall

"broadcasting, televising, recording or taking photographs in the courtroom and areas immediately adjacent thereto." *See History of Cameras, Broadcasting, and Remote Public Access in Courts*, Admin. Off. Of the U.S. Cts., https://perma.cc/C422-UPZX ("*History of Cameras in Courts*"). This prohibition was included in the Code of Judicial Conduct for United States federal Judges and applied to both criminal and civil cases.

In 1988, Chief Justice Rehnquist created an Ad Hoc Committee on Cameras in the Courtroom to study the issue. *See id.* The Ad Hoc Committee recommended a pilot program to permit electronic media coverage of civil proceedings in six district and two appellate courts. *Id.* In 1990, the Judicial Conference adopted the report, and struck the prohibition on broadcasting from the Judicial Code of Conduct. *Id.* In its place, the Conference adopted a policy that continued to prohibit the broadcasting of federal proceedings but made an exception to permit courts to allow broadcasting during "investitive, naturalization, or other ceremonial proceedings." *Id.* As for other proceedings, broadcasting was permitted only for limited internal court purposes, and in accordance with pilot programs approved by the Judicial Conference. *Id.*

The pilot program recommended by the Ad Hoc Committee and adopted by the Judicial Conference lasted three and a half years, from July 1, 1991, to December 31, 1994. *Id.* Based on the pilot project, the Committee on Court Administration and Case Management ("CACM") recommended to the Judicial Conference at its September 1994 meeting that it permit broadcasting of civil proceedings in both the trial and appellate courts. *Id.* The Conference concluded, however, that the intimidating effect of cameras on some witnesses and jurors remained a concern, and it declined to adopt the CACM recommendation. *Id.* Similarly, the Conference declined to approve a proposed amendment to Criminal Rule 53. *Id.*

---

prescribe and publish the procedures for the consideration of proposed rules under this section.")

No significant changes happened over the next 25 years.  In March 1996, the Judicial Conference amended its policy to permit the broadcasting of appellate arguments, subject to any restrictions in statutes, national and local rules, and Judicial Conference policy.  *Id.*  But the Judicial Conference remained opposed to the broadcasting of district court proceedings.  In 2002, Rule 53 was amended as part of the restyling of the Federal Rules of Criminal Procedure, and changes were intended to be stylistic only.  The Advisory Committee Note explained that the word "radio" was also removed from the rule, but "the Committee does not believe that the amendment is a substantive change but rather one that accords with judicial interpretation applying the current rule to other forms of broadcasting and functionally equivalent means."  Fed. R. Crim. P. 53, Advisory Committee Note, 2002 Amendments.  In 2010, the Judicial Conference authorized another pilot project to evaluate the effect of broadcast on district court proceedings.  *See History of Cameras in the Courts*, *supra*.  Fourteen districts participated in the pilot project, which ended in July 2015.  *Id.*  In March 2016, the Judicial Conference agreed to continue the pilot project in additional districts to gather more data but did not adopt any change to the broadcast policy.  *See id.*

The pandemic brought about some changes to the broadcast policy.  In March 2020, pursuant to Coronavirus Aid, Relief, and Economic Security (CARES) Act, 15 U.S.C. § 15002(b)(1), the Judicial Conference approved a temporary exception to permit judges to use teleconference technology to provide access to some judicial proceedings while public access to courthouses were restricted due to the COVID-19 pandemic.  The exception ended on September 21, 2023.  *See Judiciary Ends COVID Emergency; Study of Broadcast Policy Continues*, Admin. Off. of the U.S. Cts., https://perma.cc/2CNC-ZH32.

4

On September 22, 2023, the Judicial Conference adopted a new broadcast policy that, for criminal matters, effectively returned to the status quo before the pandemic.  Although the policy permits a judge presiding over a civil or bankruptcy proceeding to authorize remote audio access to any part of the proceeding in which a witness is not testifying, that policy does not apply to criminal cases.  In the criminal context, the Judicial Conference policy remains that embodied in Criminal Rule 53.  *See Judicial Conference Revises Policy to Expand Remote Access Over Its Pre-COVID Policy*, Admin. Off. of the U.S. Cts., https://perma.cc/S35N-P6GP ("*Judicial Conference Revises Policy*").  And in all cases, Judicial Conference policy prohibits the broadcasting of witness testimony of any kind.  *Guide to Judiciary Policy*, Vol. 10, ch. 4 § 410.10 (Judicial Conference policy "does not allow either civil or criminal courtroom proceedings in the district courts to be broadcast, televised, recorded, or photographed for the purpose of public dissemination").

## 2. <u>Procedural background</u>

A grand jury charged former President Trump in a four-count indictment.  *See United States v. Trump*, 23-cr-257, ECF No. 1 (D.D.C Aug. 1, 2023).  This Court set a trial date for March 4, 2024.  Pretrial Order, ECF No. 39, *United States v. Trump*.

On October 5, 2023, the Media Coalition filed an application for Audiovisual Access to Criminal Trial Proceedings.  *See In re Media Application for Audiovisual Access to Trial Proceedings in United States v. Trump*, Case No. 23-mc-99 (TSC), Application, ECF No. 1 ("Media Coalition App.").  On October 11, 2023, NBCU filed a separate application seeking similar relief.  *See In re Application of NBCUniversal Media, LLC to Permit Video and Audio of Trial Proceedings in United States v. Trump*, Case No. 23-mc-107 (TSC), Application, ECF No. 1 ("NBCU App.").  On October 24, 2023, the Court consolidated the cases and entered a briefing

schedule, which required the Government to respond on November 3, 2023; the Court further ordered the former President to file any response to the applications by November 10, 2023.[2] Minute Order of Oct. 27, 2023, *United States v. Trump*.

## ARGUMENT

### I.   RULE 53 PROHIBITS THE RELIEF APPLICANTS SEEK

Rule 53's prohibition on "the taking of photographs in the courtroom during judicial proceedings or the broadcasting of judicial proceedings from the courtroom," Fed. R. Crim. P. 53, conclusively undermines the Applicants' request.  *See Carlisle v. United States*, 517 U.S. 416, 426 (1996) ("[F]ederal courts have no more discretion to disregard [a Federal] Rule's mandate than they do to disregard constitutional or statutory provisions" (citation omitted)).  The Court need proceed no further than Rule 53's plain language, as the Media Coalition acknowledges.  *See* Media Coalition App. 2 (observing that Rule 53 and Local Rule 53.1.1 "on their face, create a per se prohibition on the broadcast of criminal proceedings to those unable to attend in person").

The counterargument that NBCU advances (NBCU App. 7) finds no support in the plain language of the rule, common sense, or sound policy.  NCBU contends that Rule 53 does not prohibit using a single pool camera to transmit video of the trial to a studio, and from there to the public because Rule 53 refers only to "broadcast[s] . . . from the courtroom," which NCBU argues would not encompass the transmission of video to a studio and then from the studio to the broader public.  That nonintuitive interpretation fails for multiple reasons.  As an initial matter, NBCU defines the word "broadcast" to mean only direct transmission to a large group of people, *see* NBCU App, 6, but the term broadcast has other, more common definitions that are a better fit with

---

[2] Counsel for former President Trump has requested that government counsel convey that he takes no position with respect to these Applications.

Rule 53.  *See, e.g.*, Webster's New Collegiate Dictionary (defining "broadcast" to mean, *inter alia*, "the act of transmitting sound or images by radio or television").  NBCU's interpretation is nothing more than an attempt to "rewrit[e] or finesse[]" Rule 53 "through technical hairsplitting."  *United States v. Moussaoui*, 205 F.R.D. 183, 184 (E.D. Va. 2002); *see also In re Sony BMG Music Entertainment et al.*, 564 F.3d 1, 9 (1st Cir. 2009) (denying petition to webcast civil trial because the intention of judicial policy is clearly to forbid all broadcasting with only certain enumerated exceptions).  But even accepting NBCU's narrow definition of "broadcast," its proposal is still squarely foreclosed. NBCU's avowed intent is to undertake precisely what Rule 53 prohibits: placing a camera in the courtroom to record judicial proceedings occurring there and then broadcasting them to the public.  That such transmission may make other stops along the way does not alter the fundamental fact that NBCU would be "broadcasting judicial proceedings from the courtroom."  Fed. R. of Crim. P. 53.

That straightforward reading of Rule 53's plain text finds support in Judicial Conference policy.  That policy "does not allow either civil or criminal courtroom proceedings in the district courts *to be broadcast, televised, recorded, or photographed for the purpose of public dissemination*."  *See United States v. Google LLC*, No. 20-cv-3010, 2023 WL 6291644, at *1 (D.D.C. Sept. 8, 2023) (emphasis added) (quoting Guide to Judiciary Policy, Vol. 10, ch.4 § 410.10) (denying request to make available a publicly accessible audio feed because "[t]he governing rules compel that result").  Nor, as the Applicants suggest, is that policy outdated.  *See* NBCU App. 9 (citation omitted).  As recently as September 12, 2023, the Judicial Conference reiterated that its broadcast policy with respect to criminal cases remains the same—no part of a criminal trial may be broadcasted or recorded.  The reasons for that policy choice were not due to "cumbersome equipment" or "distracting lighting," NBCU App. 9, but because, among other

considerations, remote broadcast "could increase the potential for witness intimidation or complicate witness sequestration—vital considerations in ensuring trial proceedings are fair to all parties." *See Judicial Conference Revises Policy*, *supra*.

Neither of NBCU's two additional claims has merit. First, it claims that the Court should apply a "narrow" reading of the rule to avoid constitutional infirmity, but as discussed below, Rule 53 readily passes constitutional muster. Second, NBCU suggests that the Court Reporter Act, 28 U.S.C. § 753(b), provides a way around Rule 53 because the Court can use audiovisual recording as the official "record of proceedings," and then release the video to the public. But the Court Reporter Act simply provides that proceedings "shall be recorded verbatim by shorthand, mechanical means, electronic sound recording, or any other method, subject to regulations promulgated by the Judicial Conference and subject to the discretion and approval of the judge." 28 U.S.C. § 753(b). The purpose of the verbatim recording or transcription is for the court reporter to create the official record of the proceeding. Local Rule 53.1.1 expressly recognizes that recordings made for purposes of creating the official record are permitted. But those "official tapes that are made as part of the official record in a case will be treated in the same manner as official stenographic notes." Local Rule 53.1.1. Thus tapes, like pre-transcription notes, are not for public dissemination. *See Guide to Judiciary Policy*, *supra* (trial proceedings in the district courts may not "be broadcast, televised, recorded, or photographed for the purpose of public dissemination").

The decision in *United States v. McVeigh*, 931 F. Supp. 753 (D. Colo. 1996), is instructive. The court there had before it a motion from the news media to send directly to the press room the same audio feed of the trial that was being piped into the overflow courtroom (where no recording of the audio was permitted), so that the press could create their own recordings for public

dissemination.  The court had also originally permitted court reporters to sell audio tapes that were

created as a redundant back-up system in the same way that reporters sell transcripts upon request.

Upon reflection, however, the court concluded that this practice, and the reporters' request to

record the audio feed themselves, violated Rule 53, as the redundant audio tapes were not

themselves the official record; the official record was instead created by stenographic means.

Thus, the court concluded "the ready access to the sound recordings has resulted in the functional

equivalent of a [prohibited] broadcast of court proceedings." *McVeigh*, 931 F. Supp. at 755.[3]  That

sound interpretation parallels this District's local rules.  *See* Loc. Crim. R. 53.1.1 (recordings made

for record purposes are treated as stenographic notes and are not available to the public).

## II.    RULE 53 IS CONSTITUTIONAL AS APPLIED TO THE CRIMINAL TRIAL OF *UNITED STATES V. TRUMP.*

Applicants contend that even if Rule 53 precludes the relief they seek, the Rule is

unconstitutional as applied to *United States v. Trump*.  As an initial matter, Applicants' argument

is premature.  Applicants do not know at this juncture what arrangements will be in place at the

courthouse to accommodate public and press attendance.  Applicants decry that only a "few"

members of the public, Media Coalition App. 17 n.23 (citation omitted), or a "miniscule" number

of reporters and a "handful of members of the public," NBCU App. 3, will be able to observe the

trial.  But arrangements for the trial have not been announced, and as in most high-profile trials,

procedures for overflow space and reserved places for the media are likely.[4]  *See Moussaoui*, 205

---

[3] Encompassing the "functional equivalent" of broadcasting within the Rule was in fact exactly what the Advisory Committee intended.  When Rule 53 was amended in 2002 as part of a restyling project, the Advisory Committee noted that the word "radio" had been deleted from the rule.  But, citing to *McVeigh*, it stated that "the Committee does not believe that the amendment is a substantive change but rather one that accords with judicial interpretation applying the current rule to other forms of broadcasting and functionally equivalent means."  Fed. R. Crim P. 53, Advisory Committee Note, 2002 Amendments.

[4] Overflow courtrooms were provided, for example, to accommodate public interest in the

F.R.D. at 185 (rejecting argument that limited seating in a courthouse violates the rights of those who cannot attend).  Instead, Applicants appear to argue that no accommodation that the courthouse can make by way of increased viewing capacity can satisfy the Constitution in this case.  *See, e.g.,* Media Coalition App. 8–9, 8 n.8 (suggesting that "81.3 million victims" are entitled to attend the trial).  But no law supports Applicants' theory, and every court to have considered the issue has concluded that there is no constitutional right to a televised trial.

### A. At Most, Rule 53 Is a Content-Neutral Time, Place, and Manner Restriction that Is Fully Consistent with the First Amendment.

As an initial matter, a broadcast ban arguably does not burden speech or implicate the First Amendment in any way.  *Rice v. Kempker*, 374 F.3d 675, 678-79 (8th Cir. 2004) ("Neither the public nor media has a First Amendment right to videotape, photograph, or make audio recordings of government proceedings that are by law open to the public"); *see also United States v. Edwards*, 785 F.2d 1293, 1295 (5th Cir. 1986); *Moussaoui*, 205 F.R.D. at 186.  There is no dispute that the public, and by extension the press, has a constitutional right of access to criminal trials.  *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 579–80 (1980).  But the right of access addressed by *Richmond Newspapers* and its progeny, and guaranteed by the Constitution, is the right to attend a criminal trial—not the right to broadcast it.  *Id*. at 580.  Moreover, no court, including *Richmond Newspapers*, has ever suggested that trials must accommodate every person interested in attending. The fact that the trial is open to the public and the media, which can "attend, listen and report" to the larger public, fully satisfies the constitutional right of access.  *Edwards*, 785 F.2d at 1295.  A restriction on broadcast, therefore, neither burdens speech nor rises to constitutional proportions.

The Supreme Court has repeatedly indicated that there is no First Amendment right to

---

defendant's initial appearance in *United States v. Trump*.

broadcast a criminal trial.  As the Court explained in *Estes v. Texas*, 381 U.S. 532 (1965), it is a "misconception of the rights of the press" to conclude that "the freedoms granted in the First Amendment extend a right to the news media to televise from the courtroom."  *Id.* at 539; *see also id.* at 589 (Harlan, J., concurring) ("The rights to print and speak, over television as elsewhere, do not embody an independent right to bring the mechanical facilities of the broadcasting and printing industries into the courtroom").  Similarly, in *Nixon v. Warner Communications, Inc.,* 435 U.S. 589 (1978), the Court addressed whether the Constitution required that the press gain immediate physical access to the Nixon tapes, portions of which were played for the jury during trial.  The press, as here (*see, e.g.*, NBCU App. 30), argued that publication of the tapes was essential to the public's understanding of one of the most high-profile trials in history, and that a transcript did not adequately allow for the public to make judgments based on inflection and emphasis.   The Court rejected that argument, however, because "the same could be said of the testimony of a live witness, yet there is no constitutional right to have such testimony recorded and broadcast."  *Nixon*, 435 U.S. at 610 (citing *Estes,* 381 U.S. at 539–542 (Harlan J. concurring)).  Rule 53 is entirely consistent with the Supreme Court's repeated statements that there is no constitutional right to broadcast a judicial proceeding.

Even assuming otherwise, every court to have considered the constitutionality of broadcasting prohibitions on otherwise open trials has concluded that, to the extent they restrict speech at all, they are content-neutral time, place, and manner restrictions, fully consistent with the First Amendment.  *See, e.g.*, *Conway v. United States*, 852 F.2d 187, 188 (6th Cir. 1988); *Edwards*, 785 F.2d at 1295–96; *United States v. Kerley*, 753 F.2d 617, 619–20 (7th Cir. 1985); *Westmoreland v. Columbia Broad. Sys.*, *Inc.*, 752 F.2d 16 (2d Cir. 1984); *United States v. Yonkers Bd. of Educ.*, 747 F.2d 111, 113 (2d Cir. 1984); *United States v. Hastings*, 695 F.2d 1278, 1280

(11th Cir. 1983); *Moussaoui*, 205 F.R.D. at 183; *United States v. Shelnutt*, No. 09-cr-14, 2009 WL 3681827 (M.D. Ga. 2009); *Courtroom Television Network LLC v. New York*, 779 N.Y.S.2d 74 (N.Y. App. Div. 2004); *see also Rice*, 374 F.3d at 674.

Prohibiting cameras in the courtroom passes constitutional muster because the restriction on the manner of access is reasonable and promotes significant governmental interests. A content-neutral time, place, and manner restriction satisfies the First Amendment so long as it serves significant government interests, is narrowly tailored to those interests, and leaves open ample alternative channels for speech. *Tinius v. Choi*, 77 F.4th 691, 699 (D.C. Cir. 2023). Rule 53 readily meets that standard. First, the restriction on broadcast is neutral because it is unrelated to the underlying content. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791–93 (1989). Second, the restriction promotes a compelling government interest in ensuring a fair trial. *See Estes* 381 U.S. at 540 ("We have always held that the atmosphere essential to the preservation of a fair trial—the most fundamental of all freedoms—must be maintained at all costs."); *Cox v. Louisiana*, 379 U.S. 559, 562 (1965) ("Since we are committed to a government of laws and not of men, it is of the utmost importance that the administration of justice be absolutely fair and orderly."). The interest in a fair trial in turn ensures critical subsidiary interests such as protecting the truth-finding function of the court, ensuring the preservation and value of live witness testimony, guarding against witness intimidation, and serving judicial efficiency and economy. On this score, the knowledge that cameras are present in the courtroom can affect witnesses, jurors, and attorneys in subtle ways. Not only will the participants be cognizant of being televised, but in today's world, a broadcast is not limited to television, and the recording exists not for a moment but, for all intents and purposes, indefinitely. *See Hastings*, 695 F. 2d at 1282–83; *Kerley*, 753 F.2d at 622 ("[K]nowledge of being televised might cause the judge, jurors, or witnesses to be distracted—

whether by embarrassment, self-consciousness, anxiety or desire to 'star'"); *see also Moussaoui*, 205 F.R.D. at 187 (describing difficulties cameras pose in trial management).

Third, the broadcasting prohibition in Rule 53 is narrowly tailored because it "promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799 (citation omitted).  The choice is not between open or closed proceedings; criminal trials are open to the public.  Rather, the broadcast restriction is narrowly tailored to avoid the risks that policymakers have determined cameras pose to the fair administration of justice.  *See, e.g., Kerley*, 753 F.2d at 621.  Finally, Rule 53 does not "unwarrantedly abridge . . . the opportunities for the communication of thought" in public places, *Cox v. New Hampshire*, 312 U.S. 569, 574 (1941), because reporters are free to attend the trial and report on what they observe, *Hastings*, 695 F.2d at 128.  Accordingly, the First Amendment is fully satisfied.

Applicants recognize that governing authority is entirely against them.  Media Coalition App. 19; NBCU App. 23.  The Applicants' counterarguments—that the case law is stale, technology has changed, and the public interest in the upcoming trial is exceptional—lack merit.

There is no question that public interest in the upcoming trial is high.  But the public interest was similarly high in other cases in which courts have rejected claims that the First Amendment requires a criminal trial to be broadcast.  In *Hastings*, for example, the court faced the rare circumstance of a sitting federal judge being indicted and tried for conspiracy to solicit a bribe. 695 F. 2d at 1282–83.  The Supreme Court in *Nixon v. Warner Communications* addressed Watergate and the Nixon tapes, an extraordinary chapter of American history.  435 U.S. at 591-94.  And *United States v. Moussaoui* involved the criminal case of Zacarias Moussaoui, an Al-Qaeda member being tried for participating in the conspiracy to attack the United States on September 11, 2001.  205 F.R.D. at 188.  That attack killed some 3000 people and altered the

course of history in the United States and worldwide.  *Id.*  Yet, those courts found no constitutional infirmity when confronting the same arguments that the Applicants make here.[5]  In *Moussaoui*, for example, the court concluded that despite the public interest, the inability of every interested member of the public to observe the trial through the media "does not raise a question of constitutional proportion."  *Id.* at 186.

Nor is the case law stale and "pre-Internet."  Media Coalition App. 19.  In making this claim, Applicants rely on court of appeals cases from the 1980s, but they neglect to mention that courts within at least seven different circuits, over the course of 40-plus years, have all found that there is no constitutional right to have a trial broadcasted.  *See supra* at 11–12.  The Judicial Conference, moreover, just months ago reaffirmed its policy choice with respect to the broadcasting of trials after a long period of study.  *See Judicial Conference Revises Policy*, *supra*.

Advances in technology do not diminish the government's significant interest in ensuring a fair trial.  *See Kerley*, 753 F.2d at 622 ("That cameras may be smaller, lighter and quieter is not a change having constitutional significance."); *see also In re Sony BMG Music*, 564 F.3d at 9 (holding that despite changes in technology, there is no right to webcast a trial).  To the contrary, advances in technology raise additional concerns.  While today's technology may be less physically obtrusive in the courtroom, with fewer cables and lights, Media Coalition App. 15–16, modern technology poses an even greater threat to the fair administration of justice, *see Moussaoui,* 205 F.R.D. at 186–87 (finding that advances in technology have created new threats to the integrity of the factfinding process).  Video not only airs on television but streams and remains on the internet effectively forever.  *Moussaoui*, 205 F.R.D. at 187.  When a witness's

---

[5] Neither Applicant cites the *Moussaoui* decision, despite it addressing an exceptionally high- profile trial in which the court considered and rejected many of the same arguments that Applicants urge here.

image is captured on video, it is not just a fleeting image, but it exists indefinitely. *Id.* Paired with the ever-increasing acrimony in public discourse, witnesses and others who appear on video may be subjected to threats and harassment. Were there an appeal and retrial, witnesses who were subjected to scrutiny and harassment on social media may be unwilling to testify again. Even the knowledge that their images will circulate on social media may temper a witness's initial testimony. In addition, knowing that the trial will be broadcast in the first instance may make jurors unwilling to serve. Jurors who are seated may feel intimidated, even if efforts are made to conceal their faces. And knowing that a trial is being broadcast can lead to participants grandstanding for the cameras. *See generally id.* at 188 (cataloguing the harms that modern technology can cause to a trial, the sole purpose of which is "to determine the innocence or guilt of this defendant for the specific crimes charged in the Indictment"). Finally, whatever the merits of Applicants' argument that *United States v. Trump* is uniquely appropriate for audiovisual broadcast, the same dangers exist here, and possibly more so. Rule 53 is therefore appropriate as applied to this case.

## B. No Authority Supports the Application of Strict Scrutiny.

NBCU's argument that that Rule 53 constitutes a content-based restriction on speech requiring strict scrutiny is flawed. It cites *Ness v. City of Bloomington,* 11 F.4th 914, 923 (8th Cir. 2021), but that case involved the issue of whether an ordinance that prohibited capturing the image of a child was subject to strict scrutiny. The court found that the ordinance was not content neutral because one would have to examine the content of the film to determine whether in fact it captured a child's image. By contrast, Rule 53 implicates no content at all; it merely restricts the manner of accessing a trial. *See Hastings*, 695 F.2d at 1282 (holding that Rule 53 does not bar the press or public from any part of trial, and thus strict scrutiny does not apply); *see also Ward*, 491 U.S.

781, 791 ("The principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys.").

NBCU's arguments to the contrary are unavailing.  First, treating video and print differently is not a content-based restriction.  NBCU App. 19.  As the court in *Moussaoui* explained,

> [T]hese various forms of media are only distinguished by the manner in which the information is delivered, conveyed and packaged to the public, not by the methods by which the news is gathered.  Electronic media representatives are not excluded from the courtroom nor are they treated differently than members of the print media. . . . Rule 53 limits only the equipment members of the media are permitted to bring into the courtroom.

205 F.R.D. at 185–86; *accord Hastings*, 695 F. 2d at 1282.

Second, NBCU argues that broadcast prohibition is content based because "no such sweeping ban exists for civil proceedings and other courthouse activities."  NBCU App. 19.  But Judicial Conference policy prohibits broadcasting of all trial proceedings and witness testimony, in both civil and criminal cases.  Ceremonial proceedings, such as investitures and naturalizations are ceremonies, not trials, and therefore do not implicate the government's compelling interest in ensuring a fair trial.  It makes little sense to argue that allowing the broadcast of purely ceremonial events makes Rule 53 by comparison a content-based restriction on speech.  Moreover, even if the Rules treated civil and criminal trials differently, that would not make Rule 53 unconstitutional.  Policymakers are entitled to consider the differing stakes in a criminal trial and the societal interest in ensuring the solemnity of criminal proceedings where the accused may face loss of liberty.  And civil and criminal trials are treated differently in many contexts, including in both the Constitution and in the Federal Rules.  *See, e.g.*, U.S. Const. amend. VI (applicable only to criminal cases); *Baxter v. Palmigiano*, 425 U.S. 308, 318–19 (1976) (permitting the factfinder in civil cases—but not criminal cases—to draw adverse inferences from a defendant's invocation of the Fifth

Amendment privilege against self-incrimination); Fed. R. Evid. 404(b)(3) (requiring notice only in criminal cases).

Finally, NBCU contends that Rule 53 is a content-based restriction on speech because it seeks "to determine what speech is good for the public and what speech is bad." NBCU App. 21. This is inaccurate. Rule 53 does not in any way differentiate "good" from "bad" content; the upcoming criminal trial will be open to any member of the public and any type of reporter, print or broadcast. Rule 53 restricts only the manner in which the trial is transmitted to the broader public. *Kerley*, 753 F.2d at 620 (holding that "a *limitation* on the public access to a trial is not subject to the same 'strict scrutiny' given a denial of access"). At bottom, "the inability of every interested person to attend the trial in person or observe it through the surrogate of the media does not raise a question of constitutional proportion," let alone establish a content-based restriction triggering strict scrutiny. *Moussaoui*, 205 F.R.D at 186.

## C. Whether Cameras Should Be Permitted in the Courtroom Is Ultimately a Policy Question.

Applicants contend the day has come to permit criminal trials to be broadcast. *See* Media Coalition App. 10–20; NBCU App. 23–32; Decl. of Rebecca Blumenstein; Decl. of Marc Greenstein. They posit that state courts have demonstrated that broadcasting does not degrade the integrity of the criminal justice process; that some academics and judges support it; that it was permitted during the recent pandemic allegedly without ill effect; that modern technology, in their view, makes the process non-disruptive; and that broadcasting would enhance public confidence in the proceedings, among other arguments. *Id.* But these are all policy arguments best left to legislators and rulemakers. *See Hastings*, 695 F.2d at 1284 (issue of cameras in the courtroom should be addressed to the appropriate rulemaking authority); *Kerley*, 753 F.2d at 622 (petitioner's arguments best directed at those who make the rules); *Moussaoui,* 205 F.R.D. at 186 (question is

one of social and political policy best left to Congress and the Judicial Conference).

Here, the Judicial Conference—having studied the issue for decades—reaffirmed the policy of the federal courts in September 2023.  Its policy judgment was to continue to prohibit the audio or video broadcasting of criminal trials.  While Applicants are free to advocate their views to policymakers,[6] this Court should decline their invitation to ignore the binding nature of Federal Rule of Criminal Procedure 53.  Accordingly, the Applications should be denied.

## CONCLUSION

For all the reasons stated above, the Applications should be denied.

Dated:  November 3, 2023

Respectfully submitted,

JACK SMITH
Special Counsel

*/s/ James I. Pearce*
James I. Pearce
John M. Pellettieri
Assistant Special Counsels
950 Pennsylvania Ave NW, Room B-206
Washington, DC 20530
Tel: (202) 532-4991
Email:  james.pearce@usdoj.gov

*Counsel for the United States*

---

[6] The Media Applicants have already written to the Advisory Committee on Criminal Rules requesting that the Committee consider an amendment to Rule 53 to either allow broadcasting in criminal trials, or to allow courts to grant exceptions to the rule for trials of extraordinary public interest.  *See* Ltr. from Media Orgs. to Comm. on Rules of Prac. and Proc. (Oct. 5, 2023), *available at* https://perma.cc/XX39-AR6Y.  At the October 26, 2023, meeting of the Advisory Committee, the Chair established a subcommittee to study the issue.