IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE MEDIA APPLICATION FOR AUDIOVISUAL ACCESS TO TRIAL PROCEEDINGS IN UNITED STATES OF AMERICA V. DONALD J. TRUMP | Case No. 23-mc-99-TSC |

**REPLY IN SUPPORT OF MEDIA COALITION'S APPLICATION FOR
AUDIOVISUAL ACCESS TO CRIMINAL TRIAL PROCEEDINGS**

Through its Application for Audiovisual Access ("Appl.") (Dkt. 1), the Media Coalition[1] acts on behalf of millions of Americans who have an unprecedented interest in observing—for themselves—the prosecution of former President Donald Trump on felony charges of attempting to subvert the 2020 election. Because Trump is not only a former president but also a current candidate campaigning to return to the White House, the public's ability to monitor his trial is a basic matter of democratic self-governance. Moreover, in supporting audiovisual access, Trump has characterized this action as bearing "all the unfortunate badges of a trial in an authoritarian regime, lacking legitimacy or due process." Trump Resp. at 4 (Dkt. 19). This rhetoric, and its challenge to the very legitimacy of this proceeding, only underscores the crucial need for the public to be able to see this trial firsthand. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572 (1980) ("[I]t is difficult for [people] to accept what they are prohibited from

---

[1] The Media Coalition includes E.W. Scripps Company (operator of Court TV), as well as Advance Publications, Inc., American Broadcasting Companies, Inc. d/b/a ABC News, The Associated Press, Bloomberg L.P., Cable News Network, Inc., Dow Jones & Company, Inc., publisher of The Wall Street Journal, Los Angeles Times Communications LLC, National Association of Broadcasters, National Cable Satellite Corporation d/b/a C-SPAN, National Press Photographers Association, News/Media Alliance, The New York Times Company, POLITICO LLC, Radio Television Digital News Association, Society of Professional Journalists, TEGNA Inc., Univision Networks & Studios, Inc., and WP Company LLC d/b/a The Washington Post. Reuters News & Media Inc. has filed notice that it also joins the Media Coalition's Application.

1

observing."). Of all trials conducted throughout American history, this one needs the public trust that only a televised proceeding can foster. Because the Constitution allows—indeed requires—such access here, the Federal Rules cannot prohibit it.

## ARGUMENT

I. **THE GOVERNMENT APPLIES THE WRONG LEGAL STANDARD**

In opposing the Application, the Government errs both in urging that Criminal Rule 53 "arguably does not burden speech or implicate the First Amendment in any way," and then arguing that any such burdens, in this case, are at most "content-neutral time, place, and manner restrictions" subject to intermediate scrutiny. U.S. Opp. at 10-11 (Dkt. 16).[2] Rule 53 implicates First Amendment rights in two distinct ways, each of which is reviewed under a different legal standard.

**First**, it is well-established that constitutional speech rights include the act of making audiovisual recordings:

> We easily dispose of [the state's] claim that the act of creating an audiovisual recording is not speech protected by the First Amendment. This argument is akin to saying that even though a book is protected by the First Amendment, the process of writing the book is not. Audiovisual recordings are protected by the First Amendment as recognized "organ[s] of public opinion" and as a "significant medium for the communication of ideas."

*Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1203 (9th Cir. 2018) (quoting *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952)). At least four Circuits have specifically recognized an affirmative First Amendment right to record public conduct. *See* Appl. at 16-17,

---

[2] In its opening brief, NBCUniversal Media ("NBCU") persuasively argues that, as a matter of statutory construction, Criminal Rule 53 does not bar the audiovisual access sought here. For all of the reasons stated by NBCU in its separate application, the Media Coalition joins that argument. The Media Coalition here addresses the constitutional question that arises if the Court instead takes the view that Criminal Rule 53 forecloses audiovisual access in this case.

n.22.  Thus, some challenges to the constitutionality of Criminal Rule 53 are premised upon the rights of the public to record.  Such a challenge would be decided based on either intermediate scrutiny, if the provision were deemed a "time, place, and manner" restriction, U.S. Opp. at 11-12 (citing authority), or strict scrutiny, if the provision barring specific forms of media is recognized as a content-based restriction.  The body of largely decades-old cases from other jurisdictions to consider Criminal Rule 53 have generally done so through this lens.[3]  But that is <u>not</u> the basis for the Media Coalition's Application in this case.

**Second**, the Media Coalition's Application rests on a related but separate First Amendment right: the *public access* right that the Supreme Court articulated in *Richmond Newspapers* and its progeny.  *See, e.g.*, *Press-Enter. Co. v. Superior Court*, 478 U.S. 1 (1986) ("*Press-Enter. II*"); *Press-Enter. Co. v. Superior Court*, 464 U.S. 501 (1984) ("*Press-Enter. I*"); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596 (1982); *see generally* Appl. at 6-8.  Under that line of authority, courts are "obligated to take every reasonable measure to accommodate public attendance at criminal trials."  *Presley v. Georgia*, 558 U.S. 209, 215 (2010) (per curiam).  In this case affecting the national electorate, *meaningful* access for the public to the upcoming criminal trial cannot be accomplished through in-person attendance alone.[4]  If the Court accepts

---

[3] This Application raises a question of first impression in this Circuit, as neither the D.C. Circuit nor the Supreme Court has considered the constitutionality of Criminal Rule 53 since *Richmond Newspapers*.  *Nixon v. Warner Communications, Inc.*, 435 U.S. 589 (1978), cited by the Government, U.S. Opp. at 11, is inapt.  That case involved a petition for access to President Nixon's White House Tapes for the purpose of copying, selling, and broadcasting them.  The issue decided by the Court did not remotely involve the use of cameras in courtrooms and the First Amendment implications of that issue.  Instead, *Nixon* concerned whether the press had a broader right of access to the tapes themselves, "to which the public never had physical access." 435 U.S. at 609.  Here, the Media Coalition does not seek information "superior to that of the general public," *id.*, but rather seeks to vindicate a meaningful right for the general public to observe proceedings.  *Richmond Newspapers*, 448 U.S. at 572-73.

[4] This issue is far from "premature," as the Government urges.  U.S. Opp. at 9.  It is obvious

that fundamental proposition, Criminal Rule 53 must yield to an as-applied constitutional challenge unless barring audiovisual access satisfies the *Richmond Newspapers/Press Enterprise II* standard, rather than a more general review standard for regulations that incidentally implicate speech. *See* Appl. at 9-17.

In *Courthouse News Service v. Planet*, for example, the Ninth Circuit applied the "presumption of access under *Press-Enterprise II*" in striking a court policy that delayed the public availability of civil complaints pending processing by court staff. 947 F.3d 581, 595-96 (9th Cir. 2020). While recognizing that the California state court's regulations "resemble time, place, and manner restrictions—they are content-neutral and affect only the timing of access to the newly filed complaints," the court analyzed the issue under constitutional *access* principles. *Id.* The Supreme Court has articulated a specific standard to evaluate such restrictions, even partial restrictions such as time delays. *Id.*; *see generally Washington Post v. McManus*, 355 F. Supp. 3d 272, 285 (D. Md. 2019) (a "doctrinal, category-based approach" to First Amendment analysis "requires courts to distinguish amongst speech-suppressing regulations much the same way a biologist distinguishes among organisms, identifying their most distinctive features and slotting each new species into its proper genus"), *aff'd*, 944 F.3d 506 (4th Cir. 2019).

Thus, where COVID-19 pandemic restrictions barred meaningful access to judicial proceedings, courts found that audiovisual access was necessary. Appl. at 11; *see also, e.g.*, *United States v. Veneno*, 80 F.4th 1180, 1190 (10th Cir. 2023) (finding no constitutional violation where court provided live audiovisual feeds despite closing courtroom as a pandemic measure because "[t]rial courts must take every *reasonable* measure to accommodate public

---

that millions of Americans with an interest in the criminal trial in this matter will be unable to view proceedings from an overflow room or rooms. The Media Coalition therefore timely submitted its Application to allow for the Court's consideration in advance of trial.

attendance at criminal trials"); *People v. Zemek*, 93 Cal. App. 5th 313, 331 (Cal. Ct. App. 2023) ("[T]he fact the trial was available to the public via livestream helped to further assure the integrity of the judicial process."); *State v. Brimmer*, 983 N.W.2d 247, 261-64 (Iowa 2022) (applying *Press-Enterprise II* standard and finding constitutional violation where courthouse closed for pandemic reasons without "live video, or even audio, feed of the trial"); *Tarpey v. State*, 523 P.3d 916, 929 (Wyo. 2023) (live audio feed "implemented the least restrictive, available option to provide virtual public access to the trial").

As the Supreme Court's doctrine has developed, it has become clear that to overcome the constitutional access right once it has attached, a party seeking closure must demonstrate that:

1. There is a **substantial probability** of prejudice to a **compelling** interest if the right is not limited. *Press-Enter. II*, 478 U.S. at 13-14; *Press-Enter. I*, 464 U.S. at 510; *Richmond Newspapers, Inc.*, 448 U.S. at 580-81.

2. There is **no alternative** to a limitation of the access right that will adequately protect against the threatened harm. *Press-Enter. II*, 478 U.S. at 13-14; *Washington Post v. Robinson*, 935 F.2d 282, 289-90 (D.C. Cir. 1991).

3. Restricting access will **effectively** protect against the threatened harm. *Press-Enter. II*, 478 U.S. at 14; *Robinson*, 935 F.2d at 291-92.

4. The restriction on access is **narrowly tailored** to minimize the harm to the public's access rights. *Press-Enter. II*, 478 U.S. at 13-14; *Robinson*, 935 F.2d at 287; *see also Shelton v. Tucker*, 364 U.S. 479, 488 (1960) (even "legitimate and substantial" interests "cannot be pursued by means that broadly stifle fundamental personal liberties").

The rationales proffered by the Government in its Opposition—*i.e.*, that "the knowledge that cameras are present in the courtroom can affect witnesses, jurors, and attorneys in subtle ways," U.S. Opp. at 12; *see also id.* at 14-15—wholly fails to meet this standard for overcoming the right of meaningful access to criminal trials.

## II. THE GOVERNMENT'S OBJECTIONS ARE UNPERSUASIVE

The Government's broad and generalized assertion that audiovisual coverage may adversely affect legal proceedings is not supported by experience or research. *See generally* Appl. at 10-17.[5] Nor are the generalized concerns particularly apt here, where the criminal trial will be extensively covered, with or without cameras, and where jurors will not be shown regardless of whether cameras are otherwise permitted in the courtroom.

To be sure, the witnesses in this case will be subject to public scrutiny, regardless of the presence or absence of cameras in the courtroom. They will be identified by name, their pictures will be published and broadcast, and their testimony will be dissected and analyzed. The witnesses should know this from firsthand experience, as the trial is not likely to be their first time testifying about the subject matter at issue. Many witnesses in the case will likely have already had to testify in video depositions during the January 6 Committee's investigation, or

---

[5] The Government notes that the Advisory Committee on Criminal Rules convened in October and discussed a suggestion by U.S. Representative Adam Schiff and other Members of Congress to allow Trump's trial to be broadcast. U.S. Opp. at 18. However, the Committee's conclusion was far from a "policy judgment . . . to continue to prohibit the audio or video broadcasting of criminal trials." *Id*. Rather, the Committee reporters issued a memorandum concluding it would be impossible to implement a change in time for Trump's upcoming trial in this Court given the Judicial Conference's rule change procedures, and the reporters declined to make a policy judgment about amending Rule 53. *See* Rule 53 proposal to authorize broadcasting in the federal trials of former President Donald Trump (23-CR-E) at 1 (Sept. 14, 2023), https://www.uscourts.gov/sites/default/files/2023-10_criminal_rules_committee_agenda _book_final_10-5_0.pdf (memo is "about the feasibility of doing what the proposal asks, and do[es] not address the merits of the proposal itself").

Moreover, at the Criminal Rules Committee meeting, members discussed a suggestion by the Coalition, which is available at https://www.uscourts.gov/rules-policies/archives/suggestions/20-media-organizations-23-cr-f. *See* Josh Gerstein, *Televise Trump's federal trials? Judicial panel says its hands are tied*, Politico (Oct. 26, 2023), https://www.politico.com/news/2023/10/26/ trump-federal-trials-televise-00123801. The head of the Committee, District Court Judge James Dever, called the Coalition's suggestion "very thoughtful," and he announced that a new subcommittee, headed by District Court Judge Robert Conrad, would look into amending Rule 53. *See id.*; *see also* U.S. Opp. at 18 n.6 (citing the Coalition's suggestion and noting the creation of the Rule 53 subcommittee).

6

live at the January 6 Committee hearings, and video is available online for both.[6]  Many witnesses in this matter will also testify in the Georgia case concerning election interference claims, which will itself be televised.[7]  The concern that some attorneys might "grandstand" when cameras are present—however one might interpret what constitutes "grandstanding"—is similarly conclusory.  If an attorney steps out of bounds of the Rules of Professional Conduct, the rules of decorum, or any order of the Court, the solution is to impose appropriate penalties.  In any event, practical experience from the *Chauvin* case and other televised judicial proceedings teaches that the presence of cameras quickly fades into the background for trial participants.  *See generally* Appl. at 13-15.

Moreover, even if these concerns were credible (they are not), the Supreme Court has repeatedly made clear that the solution to problems generally attendant to publicity is not to limit access, but, again, for the trial judge to exercise firm control over the proceedings themselves by invoking a variety of curative devices to lessen any risk of prejudice.  The Court may conduct *voir dire* of prospective jurors to ensure they can discharge their responsibilities free from the impact of prejudicial publicity.  *E.g.*, *Press Enter. II*, 478 U.S. at 15 ("Through voir dire . . . a court can identify those jurors whose prior knowledge of the case would disable them from rendering an impartial verdict.").  The Court may admonish the jury and witnesses not to read, watch, or listen to press reports.  *E.g.*, *Chandler v. Florida*, 449 U.S. 560, 582 (1981).  The Court may even levy sanctions upon attorneys who "play to the public."  Those options and more are available here, and the Government does not and cannot explain why they would not suffice.

---

[6] *See* Select Jan. 6th Comm. Final Report & Supporting Materials Collection, https://www.govinfo.gov/collection/january-6th-committee-final-report.

[7] Jozsef Papp, *Fulton judge says Trump court proceedings will be televised*, Atlanta J.-Const. (Aug. 31, 2023), https://www.ajc.com/politics/fulton-judge-says-trump-court-proceedings-will-be-televised/GNUTN4TYAVCQ7IPMOONTIY6SJM/.

Ultimately, the Government in its reply to Trump's Response decries that audiovisual access might convert a trial into a "media event." U.S. Reply at 1 (Dkt. 21).[8] It is naïve to think that Trump's trial will be anything other than a "media event." The Media Coalition believes that the more people who see the trial in real time, the stronger the case for public acceptance of the result. The federal prosecution of a former President on these charges relating to a national election will, and should, be a matter of spirited public discussion. The trial proceedings will, and should, be discussed across the nation. The question the Application poses is whether, for the tens of millions of interested people who have a constitutional right of access to this criminal trial, they will receive information *solely* from third-party summaries and the characterizations of out-of-court advocates. The answer to that question is that Americans should be permitted to observe the entirety of these historic proceedings—dignified, carefully managed, and under the control of the Court.

## III. THE DEFENDANT'S REQUEST FOR AUDIOVISUAL ACCESS ALLEVIATES ANY FAIR TRIAL CONCERN

In calling for audiovisual access in his Response,[9] Trump has also waived any fair trial objection he might otherwise have if the Application is granted. As such, any due process concerns arising from audiovisual access can be disregarded. Indeed, if the Government dropped its objection, the Court might properly deem any broadcast ban waived. The Federal Rules of

---

[8] The Government in its reply to Trump's Response complains that, in supporting the Application's request for audiovisual access, Trump seeks "special treatment." U.S. Reply at 1. But Trump did not move for access himself, he merely responded in support of the press's access motions pursuant to a Court order seeking his position on those motions. *See* Minute Order, *United States v. Trump*, No. 23-cr-257-TSC (D.D.C. Oct. 27, 2023).

[9] Trump has also repeated that call publicly, including by announcing at a campaign rally last week that "I want cameras in every inch of that courthouse." *Former President Trump Wants Cameras in Election Interference Trial*, C-SPAN, https://www.c-span.org/video/?c5092875/president-trump-cameras-election-interference-trial (Nov. 11, 2023), at 2:17-24.

Criminal Procedure are generally waivable by parties. *See, e.g.*, *U.S. v. Mezzanatto*, 513 U.S. 196, 201 (1995) ("The provisions of those rules are presumptively waivable"); *see also, e.g.*, *U.S. v. Mann*, 61 F.3d 326, 331 (5th Cir. 1995) (citing *Mezzanatto* for this proposition in its discussion regarding Rule 16(a)); *U.S. v. Foster*, 652 F.3d 776, 782 (7th Cir. 2011) (same for Rule 24(c)); *U.S. v. Myers*, 801 F.3d 1116, 1123 (9th Cir. 2015) (same for Rule 11(c)). But even absent a finding that Criminal Rule 53 is waived, the defendant's position underscores that the Government cannot satisfy the *Press-Enterprise II* standard to limit meaningful public access.

## CONCLUSION

For all the reasons stated herein and in its Application, the Media Coalition respectfully asks that the Court enter an order granting the Application.

Dated: November 17, 2023

Respectfully submitted,

BALLARD SPAHR LLP

/s/ *Chad R. Bowman*
Chad Bowman (#484150)
Charles D. Tobin (#455593)
Maxwell S. Mishkin (#1031356)
Lauren P. Russell (#1697195)
1909 K Street NW, 12th Floor
Washington, DC 20006
Telephone: (202) 661-2200
Fax: (202) 661-2299
bowmanchad@ballardspahr.com
tobinc@ballardspahr.com
mishkinm@ballardspahr.com
russelll@ballardspahr.com

*Counsel for the Media Coalition*