**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE MEDIA APPLICATION FOR AUDIOVISUAL ACCESS TO TRIAL PROCEEDINGS IN UNITED STATES OF AMERICA V. DONALD J. TRUMP | Case No. 23-mc-99-TSC |
| IN RE APPLICATION OF NBCUNIVERSAL MEDIA, LLC TO PERMIT VIDEO AND AUDIO OF TRIAL PROCEEDINGS IN UNITED STATES V. DONALD TRUMP | Case No. 23-mc-107-TSC

Hearing Requested |

**REPLY IN SUPPORT OF APPLICATION OF NBCUNIVERSAL MEDIA, LLC
TO PERMIT VIDEO AND AUDIO OF TRIAL PROCEEDINGS IN
UNITED STATES V. DONALD TRUMP**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 2

I.   This Court has authority to allow video and audio coverage of trial proceedings,
     including prompt broadcasting from outside the courtroom........................................ 2

     A.   The government advances an overbroad reading of Rule 53 that overshoots the
          statutory language, lacks any precedential support, and serves irrelevant and
          unpersuasive policy objectives. ........................................................... 3

     B.   The government agrees that the Court Reporter Act authorizes this Court to
          designate video and audio recordings the official record of the trial. .................. 9

     C.   The canon of constitutional avoidance requires the adoption of NBCU News
          Group's narrower interpretation of Rule 53. ........................................... 11

II.  A ban on video and audio coverage of trial proceedings would violate the First
     Amendment as applied to the trial in this case. ......................................... 12

     A.   The government is wrong that its overbroad interpretation of Rule 53 does not
          burden speech or implicate the First Amendment. ..................................... 12

     B.   A ban on video and audio recordings of these proceedings would be a content-
          based restriction subject to strict scrutiny. ........................................ 13

     C.   A ban on creating and disseminating video and audio of criminal trials cannot
          withstand strict scrutiny................................................................... 16

     D.   The government's interpretation of Rule 53 does not even satisfy intermediate
          scrutiny. ................................................................................. 20

III. The Court should exercise its discretion to permit video and audio coverage of this
     historic trial. ............................................................................ 21

CONCLUSION AND PRAYER FOR RELIEF .................................................. 23

# TABLE OF AUTHORITIES

**Cases**

*ABC, Inc. v. Stewart*,
   360 F.3d 90 (2d Cir. 2004) ................................................................................................ 14

*Am. Civil Liberties Union of Illinois v. Alvarez*,
   679 F.3d 583 (7th Cir. 2012) ............................................................................................. 12

*Baumann v. District of Columbia*,
   987 F. Supp. 2d 68 (D.D.C. 2013) ..................................................................................... 12

*Boardley v. U.S. Dep't of Interior*,
   615 F.3d 508 (D.C. Cir. 2010) ........................................................................................... 21

*Bostock v. Clayton Cty.*,
   140 S. Ct. 1731 (2020) ......................................................................................................... 6

*Carlisle v. United States*,
   517 U.S. 416 (1996) ............................................................................................................. 3

*Chandler v. Florida*,
   449 U.S. 560 (1981) ......................................................................................... 5, 17, 18, 19

*Citizens United v. Fed. Election Comm'n*,
   558 U.S. 310 (2010) ..................................................................................................... 12, 16

*Craig v. Harney*,
   331 U.S. 367 (1947) ....................................................................................................... 2, 21

*Duncan v. Walker*,
   533 U.S. 167 (2001) ............................................................................................................. 5

*Estes v. Texas*,
   381 U.S. 532 (1965) ....................................................................................................... 5, 18, 19

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ........................................................................................................... 12

*Fed. Express Corp. v. U.S. Dep't of Commerce*,
   39 F.4th 756 (D.C. Cir. 2022) ........................................................................................... 11

*Heintz v. Jenkins*,
   514 U.S. 291 (1995) ........................................................................................................... 11

*Hollingsworth v. Perry*,
   558 U.S. 183 (2010) ............................................................................................................. 7

*In re Mack*,
   126 A.2d 679 (Pa. 1956) ..................................................................................................... 5

*McCullen v. Coakley,
    573 U.S. 464 (2014) ................................................................................... 18

Nat'l Pub. Radio, Inc. v. Klavans,
    560 F. Supp. 3d 916 (D. Md. 2021) ............................................................ 17

Ness v. City of Bloomington,
    11 F.4th 914 (8th Cir. 2021) ....................................................................... 12

Nixon v. Warner Communications, Inc.,
    435 U.S. 589 (1978) ................................................................................... 13

In re Pratt,
    511 F.3d 483 (5th Cir. 2007) ...................................................................... 10

Project Veritas v. Schmidt,
    72 F.4th 1043 (9th Cir. 2023) ............................................................... 12, 15

*Reed v. Town of Gilbert,
    576 U.S. 155 (2015) .............................................................................. 14, 16

Richmond Newspapers, Inc. v. Virginia,
    448 U.S. 555 (1980) ..................................................................................... 2

*Smith v. U.S. District Court Officers,
    203 F.3d 440 (7th Cir. 2000) ........................................................................ 9

In re Sony BMG Music Entertainment,
    564 F.3d 1 (1st Cir. 2009) ............................................................................. 7

State v. Smart,
    622 A.2d 1197 (N.H. 1993) ........................................................................ 18

*United States v. Allen,
    34 F.4th 789 (9th Cir. 2022) ................................................................. 14, 21

United States v. Austin,
    954 F.3d 877 (6th Cir. 2020) ...................................................................... 10

United States v. Bainbridge,
    746 F.3d 943 (9th Cir. 2014) ...................................................................... 10

United States v. Google LLC,
    2023 WL 6291644 (D.D.C. Sept. 8, 2023) ................................................... 8

United States v. Grace,
    461 U.S. 171 (1983) ................................................................................... 16

United States v. Hansen,
    143 S. Ct. 1932 (2023) ................................................................................ 11

United States v. Hastings,
    695 F.2d 1278 (11th Cir. 1983) ............................................................ 14, 17

*United States v. Kerley,*
   753 F.2d 617 (7th Cir. 1985) ........................................................................20

*United States v. McVeigh,*
   931 F. Supp. 753 (D. Colo. 1996) ................................................................10

*United States v. Moussaoui,*
   205 F.R.D. 183 (E.D. Va. 2002) .................................................................6, 14

*United States v. Sealed Defendant One,*
   49 F.4th 690 (2d Cir. 2022) ...........................................................................4

*United States v. Woods,*
   571 U.S. 31 (2013) ........................................................................................11

*United States ex rel. Eisenstein v. City of New York,*
   556 U.S. 928 (2009) ........................................................................................5

*Ward v. Rock Against Racism,*
   491 U.S. 781 (1989) ..........................................................................17, 20, 21

*Washington Post v. Robinson,*
   935 F.2d 282 (D.C. Cir. 1991) .....................................................................22

*In re WMUR Channel 9,*
   813 A.2d at 460 ............................................................................................19

**Statutes**

*28 U.S.C. § 753 ................................................................................................9

**Rules**

D. Mass. Loc. Civ. R. 83.3 .................................................................................7

Fed. R. Crim. P. 53 (1944) .................................................................................5

*Fed. R. Crim. P. 53 ...............................................................................3, 4, 9, 10

Local Civ. R. 83.1 ..............................................................................................8

**Other Authorities**

Guide to Judiciary Policy, Vol. 10, § 410.10 ....................................................7

Notes to the Rules of Criminal Procedure for the District Courts of the United States,
   4 F.R.D. 405 (1944) .....................................................................................10

## INTRODUCTION

In the government's own words, "[t]he defendant stands alone in American history for his alleged crimes.  No other president has engaged in conspiracy and obstruction to overturn valid election results and illegitimately retain power."  *United States v. Trump*, No. 23-cr-257-TSC, Dkt. 139 at 1.  Only two American Presidents—President Reagan and President Clinton—have testified in federal criminal proceedings in modern history, and both times their videotaped testimony was disseminated to the public.  This trial presents an even stronger case for audiovisual coverage.

The government nonetheless asks this Court to forbid video and audio coverage of this trial that would allow the public and future generations to see and hear for themselves the evidence and arguments.  Although the government argues that settled law forecloses this kind of coverage, that is incorrect.  There is no valid reason for such a categorical ban of video and audio here—especially given that former President Trump has now himself urged this Court to allow video and audio, obviating any concern about his due process rights to a fair trial.  The government argues that the Court should deny such coverage because Mr. Trump could try to exploit such coverage for a "public relations campaign" or turn the trial into a "carnival."  Dkt. 21 at 3.  But the risk of misbehavior by the defendant cannot possibly be grounds for barring all video and audio coverage. This Court possesses ample power and discretion to ensure both decorum and fairness.

Allowing for audiovisual coverage will also counter the risk that the parties or others could falsely portray what happens during trial.  This will ensure public confidence in the integrity of these proceedings and the federal judicial process in general.  "People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing.  When a criminal trial is conducted in the open, there is at least an

opportunity both for understanding the system in general and its workings in a particular case." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572 (1980) (plurality op.).

Despite the government's best effort to put a gloss on the plain text, Federal Rule of Criminal Procedure 53 does not impose an impregnable ban on video and audio coverage. The government's arguments to the contrary stretch the text of the Rule beyond its plain meaning. They are based on outdated policy arguments, the Judicial Council's nonbinding views, speculation, and old rulings from courts in other circuits that do not bind this Court and did not consider the arguments NBCU News Group makes here. The Court should also reject the government's reading of Rule 53 to avoid the serious constitutional problems it creates, or determine that the Rule is unconstitutional as applied in this case.

This trial raises extraordinarily important issues for our country and for democracy. "[W]hat transpires in the court room is public property," *Craig v. Harney*, 331 U.S. 367, 374 (1947), and the public should be allowed to see for itself what happens in the courtroom in this case, absent the most compelling reasons—which the government has not demonstrated. To decline to memorialize this trial on video would be a grave loss to the American people and to American history. Dkt. 1-1 (Blumenstein Decl.) at ¶ 12. For all these reasons, this Court should exercise its discretion and grant NBCU News Group's Application.

## ARGUMENT

### I.   This Court has authority to allow video and audio coverage of trial proceedings, including prompt broadcasting from outside the courtroom.

The government urges this Court to adopt a maximalist reading of Rule 53 decoupled from the text of the Rule, misunderstands the right of public access to video and audio recordings that are made the official record of proceedings under the Court Reporter Act, and forces this Court unnecessarily to confront serious constitutional issues. This Court should read Rule 53 consistent

with its plain text rather than the government's overbroad, policy-driven construction.  At the very least, this Court should exercise its discretion under the Court Reporter Act to make video and audio recordings the official record of the trial in this case.

> **A.    The government advances an overbroad reading of Rule 53 that overshoots the statutory language, lacks any precedential support, and serves irrelevant and unpersuasive policy objectives.**

The government primarily argues that Rule 53 "prohibits the relief Applicants seek." Opp. 6 (formatting omitted).  The government misreads Rule 53's plain language to try to create a sweeping prohibition of video and audio coverage of federal criminal trials that the Rule itself does not impose.  None of the government's other points—a few nonbinding decisions applying Rule 53 broadly, the Judicial Conference's advisory views, and the government's own policy views—provide any basis for adopting an overly broad interpretation of Rule 53 that the text does not support and that would advance Rule 53 into constitutionally perilous territory.

*Text.*    The Federal Rules prohibit "the taking of photographs in the courtroom during judicial proceedings or the broadcast of judicial proceedings from the courtroom."  Fed. R. Crim. P. 53.  Of course, the government is correct that this Court has "'no more discretion to disregard'" Rule 53 than the Constitution or a statute.  Opp. 6 (quoting *Carlisle v. United States*, 517 U.S. 416, 426 (1996)).  But by the same token, Rule 53—like a statute—must be interpreted faithfully to its narrow text, not given the broadest reading possible.  And the text of Rule 53 should require granting NBCU News Group's Application: Rule 53 on its face does *not* categorically prohibit all video and audio coverage of criminal trials; it bars only *broadcasts* of judicial proceedings that occur *from the courtroom*.

The government attempts to circumvent these limitations in two ways.

*First*, the government attempts to expand the word "broadcast" to cover any "'act of transmitting sound or images by radio or television.'"  Opp. 7.  But that interpretation has no

limiting principle and proves far too much.  The government's position would prevent *any* transmission of sound or images of judicial proceedings in *any* medium—for example, a Zoom hearing that only the parties and the court can access or the transmission of a video or audio feed to an overflow room inside the courthouse, which the government itself maintains is permissible. Opp. 9–10.  In other words, the government's reading would preclude what even it argues Rule 53 allows (e.g., overflow rooms—which, of course, are commonplace in high-profile trials already).

Instead, this Court should adopt the only interpretation of the word "broadcasting" that makes sense of context, purpose, and history:  "broadcasting" means the *public* dissemination of judicial proceedings from the courtroom.  *See* App. 7.  As the Second Circuit has explained, Rule 53's reference to *broadcasting* "clearly entails '*public*' distribution to make something '*widely known*.'"  *United States v. Sealed Defendant One*, 49 F.4th 690, 699 (2d Cir. 2022). Transmitting video from a pool camera to media outlets is not broadcasting, and Rule 53 does not purport to prohibit what media outlets can do outside the courtroom to disseminate the content of a court proceeding.  App. 7.  Moreover, the government offers no response at all to NBCU News Group's separate suggestion for this Court to use its own equipment to create a live feed or recording of the trial and to allow NBCU News Group and other media outlets to access that video. *See* Opp. 6–9.  Transmission from this Court's own courtroom equipment to media outlets likewise would not entail broadcasting the trial "from the courtroom" to the public under Rule 53, and the government does not argue such a transmission would be barred.  App. 7.

*Second*, the government attempts to erase the limitation that Rule 53 governs only "broadcasting *from the courtroom*."  Fed. R. Civ. P. 53 (emphasis added).  The government argues that Rule 53 bans broadcasts involving transmissions that "make other stops along the way" before the ultimate broadcast to the public.  Opp. 7.  What the government describes, however, is

(1) *recording in the courtroom* and (2) *broadcasting from outside the courtroom*.  Rule 53 does not prohibit—or even discuss—either.  If the Supreme Court tomorrow promulgated a new version of Rule 53 that deleted the phrase "from the courtroom" from the text, that significant change would make no difference at all under the government's sweeping interpretation.  App. 8.  In other words, the government's reading fails to give any effect to the Rule's limiting phrase—which is fatal to the government's interpretation under principles of statutory interpretation that require every "clause, sentence, [and] word" to be given meaning.  *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (citation omitted); *see also United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 933 (2009).

The fact that Rule 53 includes the "from the courtroom" limitation also makes perfect sense in light of the concerns that led to Rule 53's adoption in 1944.  At the time, the mechanics of in-court broadcasts could severely disrupt judicial proceedings.  One such notorious criminal trial in 1935 saw television coverage create a "circus-like atmosphere" where "photographers leap[ed] about like acrobats, while flash bulbs exploded."  *In re Mack*, 126 A.2d 679, 693 (Pa. 1956) (Musmanno, J., dissenting).  The Supreme Court addressed another famous example in *Estes v. Texas*, 381 U.S. 532 (1965), where an in-court broadcast led to serious disruption of trial proceedings with recording equipment spread across the courtroom floor, the judge's bench, and counsel table.  *Id.* at 536; *see also* App. 8–9 (collecting other examples).  It was sensible for the drafters of the Federal Rules of Criminal Procedure to focus on prohibiting from-the-courtroom broadcasts.  They were disruptive, and it was only later that technological advances would make outside-the-courtroom broadcasts possible.  *See, e.g.*, *Chandler v. Florida*, 449 U.S. 560, 576 (1981).  And although Rule 53 was amended in 2002 to omit the word "radio" from the prohibition on "radio broadcasting from the courtroom," Fed. R. Crim. P. 53 (1944), that amendment left the

"from the courtroom" limitation in place, *see* App. 8.

 ***Precedent.*** As the government effectively concedes, the proper interpretation of Rule 53 is an open question in this Court.  The government cites no decision of the Supreme Court or D.C. Circuit interpreting Rule 53 at all, much less addressing whether and (if so) how Rule 53 applies to out-of-courtroom broadcasts.  *See* Opp. 6–9.  There is none.  To be sure, other courts have read Rule 53 to preclude video coverage of criminal trials, but they did not address the arguments that NBCU News Group is making here based on the actual text of the Rule and the context of its enactment.  This Court therefore should reject the government's attempts to delete the phrase "from the courtroom" and expand Rule 53's language to cover out-of-courtroom broadcasts.

 In the absence of any controlling decision, the government relies most heavily on *United States v. Moussaoui*, 205 F.R.D. 183 (E.D. Va. 2002).  *See* Opp. 7, 13–15.  But the district court in *Moussaoui* did not address the scope of Rule 53 because the media applicants there sought to record and telecast the trial to the public solely on First Amendment grounds.  *Moussaoui*, 205 F.R.D. at 184–85.  Although the government plucks out a single sound bite—observing that "Rule 53 [cannot] be rewritten or finessed through technical hairsplitting," *id.* at 184—the *Moussaoui* decision never addresses NBCU News Group's argument that allowing a single pool camera to relay the proceeding to media outlets outside the courtroom comports with the proper, faithful reading of Rule 53's text.  What the government decries as "technical hairsplitting" is actually simple adherence to "the law as written"—rather than the law as it could have been (but was not) written.  *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1749 (2020).  Plus, if any argument here seeks to "rewrit[e] or finess[e]" the text, it is the government's argument that "broadcasting from the courtroom" includes any video transmission *even if the broadcasting itself occurs outside the courtroom.  Supra*, at 3–5.

The government also cites *In re Sony BMG Music Entertainment*, 564 F.3d 1 (1st Cir. 2009).  *See* Opp. 7.  But that case did not even concern Rule 53.  There, the First Circuit addressed District of Massachusetts Local Rule 83.3, which prohibited "any recording" *or* "any broadcast" without limiting the location of the broadcast, and expressly stated that Rule 53 "d[id] not apply." 564 F.3d at 4–9; *see id.* at 10 (reproducing rule).  Precisely because that rule had different language, the result in that case was different—*In re Sony* has no applicability here and the local rule at issue there cannot be lumped in with Rule 53.  In any event, the First Circuit applied the "familiar canon of construction that every word or phrase in a statute or rule should, if possible, be given effect." *Id.* at 5.  But the government's interpretation here flouts that principle by deleting the limiting phrase "from the courtroom" from the Rule entirely.  *See supra*, at 4–5.

***Advisory views of the Judicial Conference.***  Because Rule 53 cannot take the government where it needs to go, the government turns quickly from the Rule itself to Judicial Conference policy statements.  Opp. 7–8.  But Judicial Conference policy is just that—policy.  It is not law. Although courts can respectfully consider the Judicial Conference's views, the Supreme Court has made clear that "the policy conclusions of the Judicial Conference" are "not binding on the lower courts" and this Court need not follow it.  *Hollingsworth v. Perry*, 558 U.S. 183, 193 (2010) (per curiam).

Deference to Judicial Conference policy would be particularly inappropriate in this case because that policy does not address the arguments NBCU News Group makes here and is far broader than Rule 53 itself.   Notably, Judiciary Policy bars judicial proceedings from being "recorded," Guide to Judiciary Policy, Vol. 10, § 410.10, whereas Rule 53 includes no such prohibition; rather, it only prohibits "broadcasting from the courtroom."  That Judicial Conference policy goes beyond the text of Rule 53 is all the more reason for this Court to decline to follow it

here, and the government's citation of *United States v. Google LLC*, 2023 WL 6291644 (D.D.C. Sept. 8, 2023), does not change this. There, Judge Mehta relied on Judicial Conference policy and Local Civil Rule 83.1—not Rule 53—to deny a request for a publicly accessible audio feed of a civil trial while allowing it for "the parties' opening statements." *Id*. at *1–2. The *Google* case says nothing at all about what Rule 53 prohibits. And Judge Mehta also acknowledged that Judicial Conference policy does not "expressly address public accessibility" in the form of an audio feed— an option that the government never addresses either and that Rule 53 would also plainly authorize. *Id*. at *1.

The bottom line is that the text of Rule 53 gives this Court discretion to allow in-courtroom video recording for out-of-courtroom broadcasts or, alternatively, allow for a publicly accessible audio feed. This Court should exercise that discretion in favor of video and audio coverage for this proceeding where a former President will stand trial, charged with alleged crimes that strike at the heart of this nation's democracy.

**Policy.** The government ultimately falls back on its view of "sound policy." Opp. 6. For example, the government complains that a video recording "streams and remains on the internet effectively forever." *Id*. at 14. Notably, this justification for prohibiting video effectively acknowledges that the government's reading of Rule 53 constitutes a content-based restriction and would forever bar the public from witnessing the proceedings in this case. *See infra*, at 13–16. The government's concern, even if it had any force today, did not exist when Rule 53's language was crafted 80 years ago. And as explained below, the government gets the policy considerations wrong because much more tailored alternatives exist to a flat ban on audiovisual coverage. *See infra*, at 17–18.

**B.** **The government agrees that the Court Reporter Act authorizes this Court to designate video and audio recordings the official record of the trial.**

The Court Reporter Act authorizes the recording of the trial "by shorthand, mechanical means, electronic sound recording, or any other methods, subject to regulations promulgated by the Judicial Conference and subject to the discretion and approval of the judge." 28 U.S.C. § 753(b). The government concedes that § 753(b) gives this Court discretion to designate video and audio recordings as the official record of this trial. Opp. 8. The government also does not contest that the Court Reporter Act would authorize an exception to Rule 53 even if Rule 53 did impose the categorical prohibition that the government tries to read into it. App. 11; *see* Fed. R. Crim. P. 53 (prohibiting broadcasting from the courtroom "[e]xcept as otherwise provided by a *statute* or these rules") (emphasis added). The government's only response is that those video and audio recordings can always be withheld from the public. Opp. 8.

That argument is wrong and misunderstands the Court Reporter Act. Although the government is correct that courts have held that video and audio recordings can be withheld from the public when they are mere backups, the government misses the more important controlling rule: when video and audio recordings constitute the official record of the trial, the public right of access attaches to those recordings as it does to any other official judicial record and is subject only to narrowly cabined exceptions. Courts have explained the distinction that the government overlooks. In *Smith v. U.S. District Court Officers*, 203 F.3d 440 (7th Cir. 2000), for example, the Seventh Circuit held that the "right of access to the records of a judicial proceeding" applies to "audiotapes of a judicial proceeding" when the tapes are the original record of the proceeding. *Id.* at 441. The Seventh Circuit held, conversely, that the public's right of access does not reach "audiotapes that merely back up the court reporter's stenographic record." *Id.* at 442. Other courts

have observed the distinction between official and backup records.  *E.g.*, *United States v. Austin*, 954 F.3d 877, 879 (6th Cir. 2020) (per curiam); *In re Pratt*, 511 F.3d 483, 485 (5th Cir. 2007).

Citing *United States v. McVeigh*, 931 F. Supp. 753 (D. Colo. 1996), the government argues that NBCU News Group's proposed use of the Court Reporter Act would circumvent Rule 53. Opp. 8.  This argument suffers from a logical flaw.  Rule 53 prohibits the broadcasting of judicial proceedings from the courtroom "[e]xcept as otherwise provided by a statute or these rules."  Fed. R. Crim. P. 53.  Even if Rule 53 were to categorically prohibit all video and audio as the government argues, the Court Reporter Act would provide exactly the kind of statutory authority that the Rule itself contemplates.  Regardless, in *McVeigh*, the court considered whether the public could access "redundant audio tapes [that] were not themselves the official record."  Opp. 9. Again, NBCU News Group has requested the use of video and audio as the official record of the trial—a fundamental difference that makes the result in *McVeigh* irrelevant here.

The government admits that its position depends not on Rule 53's text, but on the 2002 Advisory Committee Note that remarked on "other forms of broadcasting and functionally equivalent means."  Fed. R. Crim. P. 53, Advisory Committee's Notes on the 2002 Amendment; *see* Opp. 9 n.3.  But the Advisory Committee itself has cautioned that its Notes "are not to be regarded as a part of the Rules," "have been prepared without supervision or revision by the Supreme Court," "are not approved or sponsored by the Court," "have no official sanction[,] and are intended merely as suggestions and guides."  Notes to the Rules of Criminal Procedure for the District Courts of the United States, 4 F.R.D. 405, 405 (1944).  For these reasons, courts cannot read the Advisory Committee's Notes to override the Federal Rules' plain text.  *E.g.*, *United States v. Bainbridge*, 746 F.3d 943, 947 (9th Cir. 2014).  The Committee Note is especially unpersuasive because the 2002 amendment to Rule 53 deleted the word "radio" but made no other change to the

Rule—and did not expand the Rule to apply to "functional equivalents." *See* App. 14.  The 2002 Committee Note, which came decades after the rest of the Rule was promulgated, constitutes "post-enactment legislative history (a contradiction in terms)," which "is not a legitimate tool of statutory interpretation," as the Supreme Court has repeatedly and unanimously explained. *United States v. Woods*, 571 U.S. 31, 48 (2013) (citation omitted); *Heintz v. Jenkins*, 514 U.S. 291, 298 (1995) (refusing to consider post-enactment legislative history or nonbinding FTC commentary).

### C.     The canon of constitutional avoidance requires the adoption of NBCU News Group's narrower interpretation of Rule 53.

For these reasons, NBCU News Group has offered the better—and only reasonable—interpretation of Rule 53.  Even if not, this Court should still grant the Application.  So long as NBCU News Group has offered a "'fairly possible'" interpretation of Rule 53, this Court should adopt it to avoid a "constitutional collision" created by the government's broad attempt to restrain speech. *United States v. Hansen*, 143 S. Ct. 1932, 1946 (2023) (citation omitted).

The government appears to concede that NBCU News Group's reading of the Rule is at least "fairly possible":  it never argues NBCU News Group's interpretation is unreasonable or incompatible with the text.  Instead, the government defends its position as the "better" or "more common" interpretation—not the only possible one.  Opp. 6.  The government argues that this Court should not apply the constitutional avoidance doctrine on the theory that the government's own interpretation of Rule 53 "readily passes constitutional muster." *Id.* at 8.  But as NBCU News Group explained in its Application and elaborates below, the categorical ban the government asks this Court to adopt would be unconstitutional as applied to this historic criminal trial of a former President, App. 16–31, and therefore necessarily satisfies the threshold of "'serious constitutional doubts'" that brings the constitutional avoidance rule into play, *Fed. Express Corp. v. U.S. Dep't*

*of Commerce*, 39 F.4th 756, 772 (D.C. Cir. 2022) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009)).

## II.   A ban on video and audio coverage of trial proceedings would violate the First Amendment as applied to the trial in this case.

### A.   The government is wrong that its overbroad interpretation of Rule 53 does not burden speech or implicate the First Amendment.

The government argues that Rule 53 "does not burden speech or implicate the First Amendment in any way." Opp. 10. That is plainly wrong. The government's interpretation forbids video and audio of the trial, as well as speech facilitated by video and audio.

Courts have consistently rejected attempts like the government's to carve out recordings from the First Amendment. As an initial matter, "[t]he act of *making* an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech." *Am. Civil Liberties Union of Illinois v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012) (people have a right to record the police in public); *accord, e.g.*, *Project Veritas v. Schmidt*, 72 F.4th 1043, 1054 (9th Cir. 2023) (reaffirming "First Amendment right to *film* matters of public interest" because "the act of recording is itself an inherently expressive activity"). The First Amendment likewise protects any "step in the 'speech process'"—like the act of making a recording to "facilitate speech that will follow." *Ness v. City of Bloomington*, 11 F.4th 914, 923 (8th Cir. 2021) (citation omitted); *see, e.g.*, *Baumann v. District of Columbia*, 987 F. Supp. 2d 68, 75 (D.D.C. 2013) ("releasing [] recording[s] to the media" constituted speech and was protected by the First Amendment). This protection for recordings and speech that incorporates recordings reflects the more general principle that the First Amendment guards against speech restrictions regardless of the "stages of the speech process" at which a restriction "operate[s]." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 336 (2010).

The government does not seriously dispute that the First Amendment protects the right to record and the right to use recordings in news coverage. The government instead argues that the First Amendment right of public access to judicial proceedings does not secure a right for the public to record or view trial proceedings by video. Opp. 10–11. The government also cites *Nixon v. Warner Communications, Inc.*, 435 U.S. 589 (1978), where the Supreme Court held that the First Amendment did not entitle respondents to "access" tapes subject to the Presidential Recordings and Materials Preservation Act or to copy and sell those tapes to the public. *Id.* at 609. But the government's invocation of *Nixon* overlooks the differences between the NBCU News Group's Application and the Media Coalition's Application. Whatever this Court decides as to the public right of access at issue in the Media Coalition's Application, No. 1:23-mc-00099-TSC, Dkt. 1, the government's interpretation of Rule 53 as a categorical ban on audiovisual coverage unduly and unconstitutionally burdens NBCU News Group's right to create and disseminate video and audio content about the trial of former President Trump.

Nor, contrary to the government's suggestion, is NBCU News Group's Application premature. Regardless of what "arrangements will be in place at the courthouse to accommodate public and press attendance," Opp. 9, anything short of allowing the entire American public to view this trial will be insufficient. No overflow space or reserved places for the media can suffice under the First Amendment relative to the overwhelming public interest in this trial.

**B.     A ban on video and audio recordings of these proceedings would be a content-based restriction subject to strict scrutiny.**

Not only does Rule 53 clearly burden speech, but it also discriminates between different types of content for three separate reasons. The government does not meaningfully address any of them. To the contrary, the government's responses largely try to dodge the issue by insisting that the government has good reason to treat video differently. But those arguments only explain what

interests the government advances to justify a ban on video and audio of criminal proceedings—a question that goes to the *application* of strict scrutiny, not whether Rule 53 discriminates between different forms of speech based on their content so as to trigger strict scrutiny.  The Court should hold that the government's interpretation of Rule 53 is a content-based restriction that can survive constitutional examination only if it satisfies strict scrutiny.

    *First*, the ban would restrict one kind of content (video and audio of these proceedings) but allow others (transcripts, written notes memorializing these proceedings, and written and oral descriptions of them).  The government tries to rebut this point only by citing *United States v. Hastings*, 695 F.2d 1278 (11th Cir. 1983) and *Moussaoui*.  *See* Opp. 16.  But neither case is responsive to NBCU News Group's arguments.  In *Hastings*, the Eleventh Circuit did not address whether Rule 53 discriminates based on content, 695 F.2d at 1282, likely because the Supreme Court had not yet crystallized the test for content-based regulations that now controls here, *see Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).  Whatever *Hastings* held, it did nothing to answer whether a categorical ban on video and audio constitutes a content-based restriction subject to strict scrutiny.  And although in *Moussaoui* the district court saw no constitutional significance to a law allowing "a sketch artist's drawing pad or a print reporter's pen and paper" and disallowing "the television camera," 205 F.R.D. at 185, courts since then have routinely recognized a First Amendment right to record, *see supra*, at 12.  Judicial decisions applying the First Amendment to restrictions on video recordings are different—and more exacting—now than they were then.  The *Moussaoui* court also did not consider, for example, that video constitutes materially different content from a transcript—"'which cannot capture the sweaty brow, the shifty eye, the quavering voice'" and can "'never fully reflect what was communicated by the testifying witness.'"  *United States v. Allen*, 34 F.4th 789, 796 (9th Cir. 2022) (citation omitted); *ABC, Inc. v. Stewart*, 360 F.3d

90, 99–100 (2d Cir. 2004) ("[O]ne cannot transcribe an anguished look or a nervous tic.  The ability to see and to hear a proceeding as it unfolds is a vital component of the First Amendment right of access.").

*Second*, Rule 53 is a content-based restriction because no such flat ban exists for investitures, naturalization proceedings, and certain civil proceedings—a self-evident distinction based on the content at issue.  The government argues that "[c]eremonial proceedings, such as investitures and naturalizations" do not "implicate the government's compelling interest in a fair trial," and that criminal and civil proceedings are effectively treated the same because, while some civil proceedings can be broadcast, the Judicial Conference policy prohibits the broadcasting of both criminal and civil *trials*.  Opp. 16.  But that proves that Rule 53 distinguishes by content: video and audio are never allowed in federal criminal proceedings, but are allowed in other proceedings.  Further, the government's arguments only try to explain interests they could adduce to *satisfy* the strict scrutiny standard that applies to content-based restrictions.  The government does not explain, let alone justify, why the strict scrutiny standard is inapplicable in the first place.  The government does not even try to refute the obvious fact that its reading of Rule 53 would treat criminal trials and other proceedings differently based on what is happening—a content-based distinction.  "[T]he activity captured by [the] recording constitutes the content . . . of that speech," and Rule 53 "draw[s] a distinction" between that content.  *Project Veritas*, 72 F.4th at 1057.

*Third*, Rule 53 is a content-based restriction because it is motivated by a concern that one kind of content (video) is more dangerous than another (print).  The government argues that this distinction does not exist because "the upcoming trial will be open to any member of the public and any type of reporter, print or broadcast."  Opp. 17.  That argument responds only to the Media Coalition's public-right-of-access argument.  It totally ignores the separate free-speech argument

that NBCU News Group raises in its own Application.  The government's interpretation of Rule 53 would allow people who have access to the trial to write down what happened, but not to broadcast it.  The government justifies that reading by arguing that video recordings present certain "dangers" to the "government's significant interest in ensuring a fair trial." *Id.* at 15.  In fact, the government argues that "modern technology poses an even greater threat to the fair administration of justice" than earlier technology did before. *Id.* at 14.  That argument concedes that the government seeks to regulate speech because of its content.  The Supreme Court has rejected similar efforts "to decide which means of communication are to be preferred for the particular type of message and speaker." *Citizens United*, 558 U.S. at 326.  The First Amendment does not permit such distinctions for speech about judicial proceedings, just as it does not permit them for speech about political elections.

In short, the government's interpretation of Rule 53 discriminates between different speech based on content and is therefore subject to strict scrutiny.

### C.    A ban on creating and disseminating video and audio of criminal trials cannot withstand strict scrutiny.

Because Rule 53 is subject to strict scrutiny, the government has the burden to show Rule 53 "furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171.  The government has failed to carry that burden in its opposition on either prong.

As an initial matter, a flat ban on creating video and audio of criminal trials serves no compelling interest.  The government points to the interest in "ensuring a fair trial."  Opp. 12.  In particular, the government fears that "the knowledge that cameras are present in the courtroom can affect witnesses, jurors, and attorneys in subtle ways." *Id*.  But these concerns are too speculative to justify a categorical prohibition on public dissemination of the audiovisual record of these proceedings and thereby exclude the public at large from viewing this momentous trial. *United*

16

*States v. Grace*, 461 U.S. 171, 182 (1983).  And regardless, here the defendant "absolutely agrees, and in fact demands, that these proceedings should be fully televised."  Dkt. 19 at 5.  That "eliminate[s]" any objection to a perceived risk to a fair trial.  *Hastings*, 695 F.2d at 1282–83.

The government has not presented any evidence "to establish that the mere presence of the broadcast media has an adverse effect on [the judicial] process" or that the trial would be "tainted by broadcast coverage."  *Chandler*, 449 U.S. at 578–79.  The government ignores the experience in the vast majority of states that broadcast criminal trials, and of federal courts during the COVID-19 pandemic—all negating the prospect that video and audio coverage is incompatible with a fair trial.  App. 24–27.  Such coverage has been allowed for high-profile trials, such as Derek Chauvin's trial for the murder of George Floyd.  *Id.* at 25.  Indeed, former President Trump's criminal trial in Georgia (where many of the same facts and witnesses are at issue) will be televised.  The government offers no rationale for why broadcasting criminal trials jeopardizes defendants, jurors, and witnesses in federal courts, while broadcasting state court proceedings poses no such risk.  At this stage, the government's specific concerns—witness and juror intimidation and grandstanding—are "prophylactic at best, and speculative at worst."  *Nat'l Pub. Radio, Inc. v. Klavans*, 560 F. Supp. 3d 916, 926 (D. Md. 2021).

Even assuming the government's overly broad interpretation of Rule 53 furthered a compelling government interest, it is not narrowly tailored to any interest.  The government concludes—without any analysis—that "the broadcasting prohibition in Rule 53 is narrowly tailored because it 'promotes a substantial government interest that would be achieved less effectively absent the regulation.'"  Opp. 13 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)).  But that is, at best, an argument to be made under the intermediate scrutiny standard.  Under strict scrutiny, Rule 53 must be "the *least restrictive* means of achieving a compelling state

interest." *McCullen v. Coakley*, 573 U.S. 464, 478 (2014) (emphasis added).  And the government does not address the less restrictive alternatives already in place across the country.

For example, courts can limit the number of cameras or microphones, sequester jurors, seal or redact confidential information, and instruct jurors "not to expose themselves to any press accounts of the case" or "listen to anything in connection with the case."  *State v. Smart*, 622 A.2d 1197, 1208 (N.H. 1993).  If video coverage of certain parts of the proceedings really did have the consequences the government suggests, the court could also limit the media to an audio stream of those parts.  The government's argument also rests on an unrealistic premise:  that witness sequestration will become more difficult with video and audio coverage of the trial, even though (as the government admits) the press will be able to attend the trial and report on the same events through the same media outlets.  The government offers nothing to corroborate its counterintuitive suggestion that witnesses will be more likely to be exposed to news coverage that includes video and audio clips versus news coverage using trial transcripts and reporters' notes.  At bottom, Rule 53 burdens too much and furthers too little.

The government also ignores the Supreme Court's clear guidance almost sixty years ago in *Estes* that "the day may come when television will have become so commonplace an affair in the daily life of the average person as to dissipate all reasonable likelihood that its use in courtrooms may disparage the judicial process."  381 U.S. at 595 (Harlan, J., concurring); *see also id.* at 540 (majority op.) ("When the advances in these arts permit reporting by printing press or by television without their present hazards to a fair trial we will have another case.").  About twenty years later, the Court noted that "change[s] in television technology" meant that many issues (e.g., disruptive, cumbersome equipment) had become "less substantial factors."  *Chandler*, 449 U.S. at 576.  Today, cameras are omnipresent in everyday life and the world has learned to live by video

during and after the COVID-19 pandemic.  And the vast majority of states now allow broadcasting, App. 23–24, whereas only two permitted it when *Estes* was decided, 381 U.S. at 540.  In other words, the Supreme Court's predictions of "future developments in the field of electronics" and "adjustment of the public" to broadcasting have since come to fruition.  *Id.* at 551–52; *see* Dkt. 1-2 (Greenstein Decl.) at ¶¶ 4–6.  These changes in what a fair trial means and what effect video and audio coverage have on our lives would make it far more unusual for an official federal proceeding of the historic magnitude of this trial to proceed without video coverage than not.

The government does not dispute this.  Rather, it argues that advances in technology create "additional concerns" because videos can live on the internet "indefinitely," may influence jurors' and witnesses' decision to serve and testify, and may subject them to harassment.  Opp. 14–15.  But the Supreme Court has explained that "[t]his kind of general psychological prejudice" can be addressed with safeguards to ensure the integrity of the proceedings.  *Chandler*, 449 U.S. at 575–77.  More importantly, the government does not acknowledge that many of the witnesses here are public figures and former high-ranking government officials who have *already* testified live or via video or audio during the January 6 Committee hearings in the House of Representatives.  To the extent this is an issue, it will exist regardless of cameras:  "[T]he psychological effect of cameras in the courtroom on trial participants is no greater than when reporters wait outside on the courthouse steps with cameras."  *In re WMUR Channel 9*, 813 A.2d at 460.  As Justice Harlan forecast in *Estes*, changes in technology have made broadcasts a "commonplace [] affair" and warrant a different outcome here. 381 U.S. at 595 (Harlan, J., concurring).

This Court will have to deal with issues involving juror or witness sequestration and witness or lawyer conduct during this trial—and the risk that defendant and his counsel may "make improper statements inside the courtroom to provoke a public reaction outside of it" (Dkt. 21 at

3)—no matter what happens.  The presence or absence of video and audio coverage—subject to the Court's authority to control courtroom proceedings and protect the trial process through reasonable restrictions—will not meaningfully change that reality.  The only difference will be whether the American public is able to view this trial as it happens, assess the evidence, and understand the result—or not.  The government offers no reason why this criminal trial, the most important in the history of the republic, should proceed in artificial obscurity when the means are readily available to provide the broadest possible public access.

### D.    The government's interpretation of Rule 53 does not even satisfy intermediate scrutiny.

The government's intermediate scrutiny argument fares no better.  Under intermediate scrutiny, a content-neutral restriction must be "narrowly tailored to serve a significant governmental interest" and "leave open ample alternative channels for communication of the information." *Ward*, 491 U.S. at 791.  The government does not properly address any of these requirements.

As an initial matter, none of the government's cases that applied intermediate scrutiny to Rule 53 are binding on this Court.  Opp. 11–12.  These decisions—all out of circuit—did not meaningfully analyze what level of scrutiny should apply.  Even when they attempt to address the level of scrutiny that should apply, they do not evaluate whether Rule 53 discriminates between certain kinds of content, as NBCU News Group has done here.  *See, e.g.*, *United States v. Kerley*, 753 F.2d 617, 620 (7th Cir. 1985) (concluding, without any analysis, that Rule 53 was subject to intermediate scrutiny because it is "a limitation on the manner of news coverage").  This Court should not follow suit.

In any event, for the same reasons discussed above, a ban on video and audio coverage of federal criminal trials fails under intermediate scrutiny just as it does under strict scrutiny.  Such a

ban would not serve a significant government interest, and it is not narrowly tailored to further any such interest.  The government fails to address whether Rule 53 "burden[s] substantially more speech than is necessary to further" the interest in a fair trial.  *Ward*, 491 U.S. at 799.  And there are "numerous and obvious less-burdensome alternatives"—"a relevant consideration in determining" whether Rule 53 is narrowly tailored.  *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 519 (D.C. Cir. 2010).

Rule 53, as interpreted by the government, also leaves no "ample alternative channels for communication of the information," and the government makes no attempt to argue otherwise. *Ward*, 491 U.S. at 791.  This is because there are none.  A transcript is no substitute to seeing and hearing a court proceeding.  *See, e.g.*, *Allen*, 34 F.4th at 796.  The right to see and hear a trial is vital to our democratic institutions and even more important in light of rampant misinformation, mischaracterization, and mistrust in coverage of current events.  More than ever, it is crucial for the American public to see for themselves how witnesses, lawyers, and the defendant present themselves before the jury.  There is simply no adequate alternative.

### III.  The Court should exercise its discretion to permit video and audio coverage of this historic trial.

The government never addresses how this Court should exercise its discretion if Rule 53 permits or the First Amendment preserves discretion to allow video and audio coverage.  The interests at stake here overwhelmingly favor allowing such coverage of this proceeding.  And the public's interest in what goes on in the "public property" of the courtroom, *Craig*, 331 U.S. at 374, is at its zenith.  This trial will shape the public understanding of the events that will play a fundamental role in our democracy today and in the future.  And it will stand alone in history.  It would rob the public at large, distort political discourse, and forever impoverish the historical record if the Court were to reject video and audio coverage here.

No countervailing considerations justify a flat ban on video and audio coverage. Any sensitive or confidential information at issue has likely already received intense public attention through impeachment proceedings and Congressional hearings that played out on live television and are preserved in video records. The risk of grandstanding from attorneys and witnesses will exist regardless of whether cameras are in the courtroom, as the government itself confirms by referring to recent proceedings involving this same defendant in New York state court where cameras were not permitted. Dkt. 21 at 3. This Court can address such behavior more effectively and directly through ordinary techniques to control courtroom misconduct that would not broadly suppress coverage of the trial. Should any specific concerns arise regarding particular evidence or witnesses, this Court retains authority to shape video and audio recordings as appropriate under the standards governing the right of public access. *Washington Post v. Robinson*, 935 F.2d 282, 287–88 (D.C. Cir. 1991).

In its brief replying to former President Trump's response to this Application, the government raised a new concern that a party might seek to manipulate the public's response to these proceedings. Dkt. 21 at 2–3. But the government misunderstands the remedy: Video and audio coverage of this trial will counteract that risk, not magnify it. The best antidote to any attempt at manipulating how the American public reacts to this trial is to allow all interested members of the public to watch it for themselves with their own eyes. *Id.* at 3. There is no doubt that a battle about the meaning of this trial will be waged before cameras outside the courtroom— on social media, websites, and cable news—regardless of whether this Court allows a camera inside. The only question is whether the public will rely on what it is told or can judge for itself. The government cannot identify any legal or practical reason why this Court should outright ban

video and audio coverage of this unprecedented official governmental event while the world debates what is happening behind the courtroom door.

## CONCLUSION AND PRAYER FOR RELIEF

This Court should (1) permit NBCU News Group to create a video and audio record of the March 2024 trial of former President Donald J. Trump via a pool camera and broadcast it to the public with only limited delay necessary for this Court to assess whether compelling interests justify withholding any portion from the public for a limited time; (2) alternatively, provide a live feed of this trial to NBCU News Group and other news outlets and authorize them to disseminate it to the public; or (3) at minimum, create a video record of this trial for historical purposes that will be released to the media and the public with minimal delay.

Dated: November 17, 2023                    Respectfully submitted,

*/s/ Theodore J. Boutrous, Jr.*
Theodore J. Boutrous, Jr. (D.C. Bar No. 420440)
Patrick J. Fuster (C.A. Bar. No. 326789)*
Milagros R. Villalobos Navas (C.A. Bar No. 324909)*
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Ave.,
Los Angeles, California 90071-3197
Tel:  (213) 229-7804
tboutrous@gibsondunn.com
pfuster@gibsondunn.com
mvillalobos@gibsondunn.com

Connor S. Sullivan (D.C. Bar No. D00506)
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, NY 10166-0193
Tel:  (212) 351-2459
cssullivan@gibsondunn.com

Gail Gove (N.Y. Bar No. 4338976)*
Erik Bierbauer (N.Y. Bar No. 3057148)*
Adam Lazier (N.Y. Bar No. 5396254)*
**NBCUNIVERSAL MEDIA, LLC**
30 Rockefeller Plaza
New York, NY 10112-0015
gail.gove@nbcuni.com
erik.bierbauer@nbcuni.com
adam.lazier@nbcuni.com

*Attorneys for Applicant NBCUniversal Media, LLC*

*\*Admitted Pro Hac Vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of November 2023, I electronically filed the foregoing with the Clerk of Court by using CM/ECF, which automatically serves all counsel of record for the parties who have appeared.  I also caused true and correct copies of the foregoing to be served via FedEx overnight delivery.

Elizabeth Shapiro
J.P. Cooney
Molly Gulland Gaston
Thomas Windom
Leslie Vigen
U.S. Attorney's Office for the District of Columbia
555 Fourth Street, NW
Washington, D.C. 20530

*Counsel for the United States*

John F. Lauro
Filzah I. Pavalon
Lauro & Singer
400 N. Tampa Street
15th Floor
Tampa, FL 33602
Todd Blanche
Blanche Law
99 Wall Street
New York, NY 10005

*Counsel for Donald J. Trump*

Charles D. Tobin
Chad Russell Bowman
Laura Russell
Maxwell S. Mishkin
Ballard Spahr LLP
1909 K Street, NW
12th Floor
Washington, DC 20006

*Counsel for Media Coalition*

*/s/ Theodore J. Boutrous, Jr.*
Theodore J. Boutrous, Jr. (# 420440)